# EXHIBIT 3

**In the Matter Of:**

*Oklahoma Farm Bureau Mutual Ins Co As Subrogee of Michael Diel vs*

*OMEGA Flex*

---

*ELIZABETH BUC, PH.D.*

*May 11, 2023*

---



## 1

Volume 1
Pages: 1-104
Exhibits: 11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

```
                                    :
OKLAHOMA FARM BUREAU MUTUAL INSURANCE  :  CASE NO. CIV-22-18-D
COMPANY AS SUBROGEE OF MICHAEL DIEL,   :
        Plaintiffs               :
vs.                              :
                                    :
OMEGA FLEX, INC.,                :
        Defendant                :
                                    :
```

ZOOM VIDEO DEPOSITION OF:
ELIZABETH C. BUC, Ph.D., PE, CFI

Appearing remotely from Livonia, Michigan

Thursday, May 11, 2023

9:01 a.m. - 12:09 p.m.  (CST)

Christine E. Borrelli, CSR, RPR, RMR

LEXITAS LEGAL
(508) 478-9795 - (508) 478-0595 (Fax)
www.LexitasLegal.com

## 2

**Counsel, witness, and court reporter appearing remotely**

APPEARANCES:

ATTORNEYS FOR THE PLAINTIFF:
    CATHCART & DOOLEY
        2807 Classen Boulevard
        Oklahoma City, OK 73106
        (405) 524-1110
    BY:  W.R. CATHCART, ESQ.
        bcathcart@cathcartdooley.com

ATTORNEYS FOR THE DEFENDANT OMEGA FLEX, INC.:
    GORDON & REES, LLP
        95 Glastonbury Boulevard - Suite 206
        Glastonbury, CT 06033
        (860) 494-7542
    BY:  CULLEN GUILMARTIN, ESQ.
        cguilmartin@grsm.com

In Attendance:
Josh Clarke, Lexitas videographer
Todd DeSmet, Oklahoma Farm Bureau

## 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ELIZABETH C. BUC, Ph.D., PE, CFI

    By Mr. Guilmartin      4

    By Mr. Cathcart          101

EXHIBIT                                          PAGE:

Exhibit 1, Notice of Deposition ....................  44
Exhibit 2, Curriculum Vitae ........................  44
Exhibit 3, Testimony List ..........................  44
Exhibit 4, Rate Sheet ..............................  44
Exhibit 5, Report, 3/3/23 ..........................  44
Exhibit 6, Notes, Buc 153-162 ......................  46
Exhibit 7, Photograph ..............................  62
Exhibit 8, ICP Analysis ............................  86
Exhibit 9, Williams Article ........................  87
Exhibit 10, Case Study .............................  92
Exhibit 11, Paterson Decision ......................  95

Exhibits digitally marked and returned to counsel with transcript.

## 4

VIDEOGRAPHER:  We are on the record on May 11, 2023, at approximately 9:01 Central Time for the remote video deposition of Elizabeth Buc in the matter of Oklahoma Fire Bureau Mutual Insurance Company as Subrogee of Michael Diel versus Omega Flex, Inc.  My name is Joshua Clarke, and I am the videographer on behalf of Lexitas.  All appearances will be noted on the stenographic record.  Will the court reporter please now swear in the witness.

ELIZABETH C. BUC, Ph.D., PE, CFI, having first been identified by the production of a driver's license, was duly sworn and testifies as follows:

DIRECT EXAMINATION BY MR. GUILMARTIN:

Q.  Good morning, Dr. Buc.  It's Cullen Guilmartin.  We have met a few times now.  I represent Omega Flex, and I'm going to have some questions for you regarding the Diel loss.  Okay?

A.  Sure.  Good morning, Cullen.

Q.  Good morning.  Can you please state your full name for the record?

A.  My name is Elizabeth Carrie Buc, B-U-C.

Q.  And where are you currently taking this deposition from?

5

1    A.  I am currently sitting in my office at Fire and
2  Materials Research Laboratory, LLC, 33025 Industrial Road in
3  Livonia, L-I-V-O-N-I-A, Michigan.
4    Q.  And so you are at the place of your employment; is
5  that correct?
6    A.  That's correct.  I'm in my office, yes.
7    Q.  And did you bring any documents with you today that
8  you have access to?
9    A.  Yeah.  So I have a paper copy of my deposition
10  notice, my reports, my handwritten notes, and then I have a
11  laptop computer to my left that is open to the Dropbox file
12  that contains all of the file materials requested as part of
13  the deposition notice.
14    Q.  Got it.  And the notes, are those your notes from
15  the lab exam?
16    A.  Yes.
17    Q.  Okay.  Are there any other notes, other than your
18  notes from the lab exam?
19    A.  No.
20    Q.  Okay.  I am going to mark your deposition notice as
21  Exhibit 1.  Dr. Buc, you mentioned that you have the
22  deposition notice with you today.  What I have marked or will
23  have marked as Exhibit 1 is the notice of your deposition.  At
24  page 3 of that deposition notice, there are some requests for
25  production, and you indicated that you have your Dropbox file

6

1  with you and that contains your file in this case; is that
2  right?
3    A.  To the best of my ability, yes, that's correct.
4    Q.  And that Dropbox link -- well, strike that.  In the
5  request for production, essentially, they ask for your file
6  related to the Diel loss; is that right?
7    A.  Yes.
8    Q.  Okay.  And the Dropbox link contains your file?
9    A.  Correct.
10    Q.  Okay.
11    A.  Yes.
12    Q.  Have you had any emails with, for example, the folks
13  at Integrity regarding this case?
14    A.  Maybe a handful of emails, but -- yeah, a handful,
15  probably, with respect to scheduling.
16    Q.  Okay.
17    A.  And then Integrity did share with me their scene
18  notes and photographs in advance of the lab exam, and so there
19  is going to be correspondence with respect to sharing that
20  Dropbox file with me.
21    Q.  Understood.
22    A.  They also shared the sign-in sheet from the lab exam
23  electronically, so that would be in an email form as well, but
24  I do have that as part of my file.
25    Q.  Okay.  So I'm not sure that I saw emails with

7

1  Integrity, nor do I believe I saw Integrity's file, but it's
2  your testimony that they provided you with certain materials
3  related to the Diel loss?
4    A.  So the certain materials related to the Diel loss
5  that are included in the Dropbox file I produced do include
6  Integrity's lab data that I attended, the sign-in sheets, and
7  Integrity's field notes and photographs.
8    Q.  Okay.  And what about the scene -- oh, so you do
9  have the scene photographs from Integrity?
10    A.  Yes, and they were requested as part of my
11  production of documents.  They specifically asked for, I
12  believe, items from Integrity --
13    Q.  Okay.
14    A.  -- and so I did upload, and I included a folder
15  called "Integrity notes and photographs."
16    Q.  Okay.  And what about Mr. Ozment, have you
17  corresponded with him in any way regarding this loss?
18    A.  There may have been one conference call, and he may
19  have been in attendance at the lab exam.
20    Q.  Okay.  That conference call, was counsel on that
21  call?
22    A.  I don't remember.  It's -- most likely, but I don't
23  remember specifically.
24    Q.  And do you recall when that occurred?
25    A.  I am looking at my invoice to determine if I can

8

1  share a date with you.  There was one conference call on
2  January 26, 2023, and that was after the lab exam.
3    Q.  And do you specifically recall Mr. Ozment being on
4  that call?
5    A.  I would say it would be typical, but I don't have an
6  independent recollection, but I would consider that typical.
7    Q.  If Mr. Ozment testified that he didn't have any
8  correspondence or communications with you, would you have any
9  reason to disagree with his testimony?
10    A.  No.
11      MR. CATHCART:  Objection to the form.
12      THE WITNESS:  Sorry, no.
13    Q.  (By Mr. Guilmartin)  Have you worked with Mr. Ozment
14  on other fire losses?
15    A.  His name is not familiar to me.  It's possible, but
16  I would say not likely.  This is probably the first case that
17  I worked with Mr. Ozment.
18    Q.  Do you have a specific recollection of any
19  communications that you had with Mr. Ozment regarding his
20  opinions?
21    A.  Not specifically, no.
22    Q.  Did you receive a copy of Mr. Ozment's report?
23    A.  I'm sure I did, yes.
24    Q.  Do you know if your report was shared with
25  Mr. Ozment?

9

1    A.   I'd have to defer to Mr. Cathcart for that.
2    Q.   Would you agree with me that if Mr. Ozment had never
3 seen your report and had never communicated with you, that he
4 couldn't have relied on your opinions in his report?
5        MR. CATHCART:  Object to the form.
6        THE WITNESS:  Again, I don't know what was provided
7 to him or not provided to him.
8    Q.   (By Mr. Guilmartin)  In preparation for today, did
9 you review the deposition transcripts of either Kelly Colwell
10 or Mark Hergenrether?
11   A.   No.
12   Q.   Have you seen those transcripts?
13   A.   No.
14   Q.   Since Kelly and Mark were deposed a couple of weeks
15 ago, so within the last two weeks, have you had any
16 correspondence or calls with them?
17   A.   No, not that I recall.
18   Q.   In preparation for today, did you review the report,
19 the Integrity report?
20   A.   I have not.
21   Q.   And did you review the Ozment report?
22   A.   I have it, but I have not.
23   Q.   What specifically did you do to prepare for today?
24   A.   So I reviewed my notes and photographs, the
25 Integrity lab exam data, the RTI ICP results, my notes from

10

1 the depositions of Mr. and Mrs. Diel, and Exponent's report in
2 this matter, as well as some literature.
3    Q.   And the ICP results that you refer to, what
4 artifacts from the fire loss did the ICP results relate to?
5    A.   So it is typical, and we did in this case take a
6 small section of the subject corrugated stainless steel tubing
7 and submitted it for detailed chemistry by inductively coupled
8 plasma spectroscopy, which was performed by RTI Laboratories.
9 And the results of ICP show minor amounts of copper present in
10 the base metal chemistries of the CSST, as well as small
11 amounts of aluminum and zinc.
12   Q.   And so the two tests, the ICP tests, relate to the
13 CSST; is that right?
14   A.   So there was a single sample submitted for analysis,
15 and yes, that's the ICP.
16   Q.   And so there was no ICP test performed on, for
17 example, the electrical conductors that were retained; is that
18 right?
19   A.   The electrical conductors were examined in the
20 laboratory, but we did not perform chemical analysis on those
21 conductors, but for we did look at the chemical composition of
22 the field of one of the coax cables, which turned out to be
23 aluminum.
24   Q.   And how did you do that?
25   A.   We did do other chemical analyses of the subject

11

1 CSST by EDS, which is energy dispersive spectroscopy.  And
2 similarly, we looked at the composition of the coax shield by
3 EDS, and it turned out to be aluminum.
4    Q.   And I know that the ICP, that was done by RTI.  And
5 then the EDS, did you do that at the lab during the lab exam?
6    A.   Yes.  The EDS was conducted by Michael Shuttlesworth
7 at Integrity while I was present.  He did perform some
8 additional analyses under my direction, which are called dot
9 mapping, and that data is contained in the Integrity lab exam
10 data file as well.
11   Q.   And that data is in your file; is that right?
12   A.   It is in my file, and it is in the Dropbox file,
13 that's correct.
14   Q.   So the universe of the chemical tests that were
15 performed at the lab exam are the ICP test on the CSST and
16 then the EDS examination of some of the other artifacts,
17 including the coax cable; is that right?
18   A.   Just for clarification, the sample for CSST -- or
19 the sample for ICP was collected during the lab exam and
20 submitted afterwards.  And the data was shared, but a
21 majority, if not all, of the EDS that was done on the CSST and
22 the coax cable shield was performed at Integrity during the
23 lab exam.
24   Q.   And who decided to perform the ICP analysis?
25   A.   We -- I would say I have been collecting ICP samples

12

1 from various CSST manufacturers over time for the purpose of
2 determining what the base metal chemistry of the 304 stainless
3 steel is, and specifically with respect to the presence and
4 concentration of copper, aluminum, and zinc.
5    Q.   And in the ICP test, one of the tests was on the
6 base metal, the CSST, and the other was on the splatter around
7 the hole; is that right?
8    A.   For clarification, did you say ICP or EDS?
9    Q.   ICP.
10   A.   No.  So ICP is only performed on what we would call
11 a comparison sample of the same run of half-inch TracPipe but
12 removed from any fire damage and the location of the
13 perforation.
14   Q.   Understood.  Were you asked -- are you aware of the
15 NTS report that Integrity performed?  They did some testing at
16 the Lightning Testing Institute.  Are you aware of that
17 testing that Integrity ran?
18   A.   So I'm aware of a lot of testing that Integrity has
19 executed over time, not only in their own high-voltage
20 laboratory, but at the lightning test facility.  I can't say
21 that I have, you know, committed to memory all of the results
22 or the reports from that work, but I am certainly aware that
23 they have performed a lot of testing, yes.
24   Q.   And were you asked to perform an ICP analysis of any
25 of the CSST that was subject to the tests that were performed

13

1  by Integrity at NTS?
2      A.  Not specifically, no.  However, I have a database of
3  ICP results from various CSST over time.
4      Q.  Yeah, no, so I'm more concerned about their testing
5  where the opposing electrode was an electrical conductor, and
6  they put the electrical conductor in contact with the CSST.  I
7  mean, they did that at NTS.  They also did it with the coffee
8  and the espresso test.  And I'm wondering if you did any ICP
9  work related to those tests?
10     A.  So, to be clear, ICP is done to determine the
11  composition of the base metal chemistry of the 304 stainless
12  steel.  And then EDS is typically used to characterize the
13  composition around any melt opening during any lab exam or
14  after any test.  With respect to your specific question, I
15  don't know if EDS was done after that particular series of
16  tests.  If it was, I haven't reviewed the data, but I'm aware
17  of other data, not only from my experience, but published by
18  others that performed EDS after either testing when in contact
19  with energized electrical conductors or otherwise.
20     Q.  Got it.  And thank you for that clarification for
21  me.  So if I have it correct, you have not performed EDS work
22  related to the NTS testing or the coffee or espresso testing
23  performed by Integrity?
24     A.  So, again, if that work has been performed, I have
25  not reviewed it.  So it's possible that has been done.

14

1  Secondly, with respect to coffee or espresso, I do have in my
2  possession a laboratory-created opening between CSST and an
3  energized conductor from Integrity that has the number R009.
4  So I have chemically analyzed that by EDS.  I just don't know
5  if R009 from Integrity corresponds to any coffee or espresso
6  or other test, but it was definitely a laboratory-created
7  opening between an energized conductor exposed to fire and
8  intimate contact with CSST.
9      Q.  When were you first retained to work on this case?
10     A.  I believe I was first contacted in late December,
11  2022.
12     Q.  And who reached out to get you involved in the case?
13     A.  Typically, Mr. Colwell will refer me to the client,
14  which in this case is Farm Bureau of Oklahoma.  And then Farm
15  Bureau of Oklahoma then retains my services as an engineer and
16  a metallurgist to examine and characterize the damage to CSST
17  from a fire scene.
18     Q.  Would you agree with me that you were not at the
19  site inspecting in that matter?
20     A.  In this particular matter, that is correct, but I
21  did review all of the photographs from both Mark Herberger
22  (sic) --
23     Q.  Hergenrether.
24     A.  -- Hergenrether, as well as Mr. Colwell.
25     Q.  Are you currently working on any other matters

15

1  involving CSST for Farm Bureau?
2      A.  No, not that comes to mind.
3      Q.  Are you currently working on any cases involving
4  Omega Flex's CounterStrike product?
5      A.  Yes.  I have a few open files that involve Omega
6  Flex CounterStrike products.
7      Q.  And what about a product sold under the trade name
8  FlashShield.  Are you working on any matters involving
9  FlashShield?
10     A.  I have had experience with FlashShield CSST, but
11  my -- I don't believe any of my current files or any recent
12  files involve FlashShield CSST.
13     Q.  Are you currently working on any matters involving
14  fires that originated at radiant barriers?
15     A.  Not at this time.
16     Q.  Have you worked on matters previously where fires or
17  radiant barriers were involved in a fire?
18     A.  So I'm aware of the product.  I have reviewed
19  testing performed by Integrity.  I have personally examined
20  radiant barrier artifacts from various fire scenes, and I have
21  even co-authored a presentation on radiant barriers with
22  Mr. Geer from Integrity.
23     Q.  And will you agree with me that the testing that is
24  performed that is at issue in your co-authored paper, that
25  electrical arcing from the radiant barrier resulted in

16

1  ignition in the testing that you performed, and that is at
2  issue in your paper?
3      A.  I would have to recall or -- I'm sorry, I'd have to
4  reread that presentation for the specifics, but I do recall
5  that not all forms and installations of radiant barrier are
6  subject to the same response under lightning strike events.
7  But, again, I would have to review that presentation
8  specifically, but my recollection is the radiant barrier
9  installed at the Diel home did not have the same
10  characteristics in terms of installation with H clips that was
11  the subject of the paper presented at ISFI with Mr. Geer.
12     Q.  Would you agree with me that there was radiant
13  barrier that was consumed within the area of origin at the
14  Diel home?
15     A.  Yes.  In general, yes.
16     Q.  And do you have any knowledge as to how the radiant
17  barrier was affixed to the side of the roof?
18     A.  So my recollection is that it's a thin foil
19  composite over an insulation and, without referring to
20  photographs, I thought it was staples as opposed to H clips.
21     Q.  And so the staples would have held this foil barrier
22  to the side of the Diel attic; is that right?
23     A.  That's my recollection without looking at specific
24  photographs of the same radiant barrier that was not consumed
25  by fire elsewhere in the Diel attic.

17

1    Q.  Would you agree with me that foil radiant barrier
2  would be conductive?
3    A.  Well, aluminum foil under some conditions and in
4  some forms can be conductive, yes.
5    Q.  I don't see anything within your report where you
6  rule out radiant barrier -- the radiant barrier as a cause of
7  this fire.  Was that outside the scope of your attention?
8    A.  So, again, in this, as well as in other CSST cases
9  as a metallurgist, I am principally retained to examine the
10  damage to the corrugated stainless steel material and to,
11  essentially, interpret and opine on the root cause of that
12  damage.  I do look at the area in which the CSST is installed.
13  But with respect to other potential ignition scenarios, I
14  leave that to the fire investigator and/or Integrity.
15    Q.  And so then would you agree with me that you are not
16  offering an origin and cause opinion consistent with NFPA 921
17  because you're not ruling out the other potential causes of
18  this fire?
19    A.  Well, I'm a certified fire investigator from the
20  International Association of Arson Investigations, and I
21  utilize my fire investigation training and experience in,
22  essentially, reviewing the work that the fire investigators
23  processing the scene and processing the evidence, you know,
24  occurs to industry standards.  But with respect to the CSST in
25  this and other cases, I am principally retained as a

18

1  metallurgist to examine, opine, and characterize the root
2  cause of that damage.
3    Q.  Right.
4    A.  But I do look -- but, yes, I mean, my examination
5  does include, you know, other artifacts in the area where the
6  CSST is installed.  So, for example, in this case we have a
7  number of conductor and coax cables.  But, yes, I am also
8  familiar with the presence of and the type or nature of the
9  radiant barrier that was in the same area.  So it is part of
10  my examination, but I certainly look at other fire
11  investigation origin determination factors, such as timeline
12  and witness statements, that support an origin determination
13  as any fire investigator would.
14    Q.  Right.  And I'm not saying that you're not qualified
15  to do an N921 cause and origin analysis.  I'm just pointing
16  out that that's not what you were retained to do here; is that
17  right?
18    A.  I would say my role is more specifically with
19  respect to the metallurgy and the root cause of the opening in
20  the corrugated stainless steel tubing in the defined area of
21  origin that has been identified by others.  But I do include
22  in my analysis, with respect to not only confirming that the
23  opening is in the general area of origin, but also other
24  factors that support origin determination, including witness
25  statements and timeline.  So I'm not trying to minimize my

19

1  role, nor am I trying to take over the position of Fire
2  Investigator Ozment.
3    Q.  Okay.  But under N921, in order to render an origin
4  and cause opinion, you have to rule out all potential
5  hypotheses for the first fuel ignited.  And here would you
6  agree with me that you have not performed that analysis
7  because, for example, you don't discuss the radiant barrier in
8  your report?
9    A.  Well, I disagree in part because I do consider other
10  factors, especially with respect to where the opening in the
11  CSST is located, and other data, including the timeline, the
12  STRIKEnet report and, you know, the presence of radiant
13  barrier, just like the presence of electrical conductors and
14  other artifacts in the area of the opening.  So, again, my
15  answer is not no.  But as a certified fire investigator, I do,
16  you know, consider that additional data in the examination
17  that I perform and the opinions that I render.
18    Q.  I'm going to open your report.  At some point, I'm
19  going to have the premarked exhibits -- and just for the
20  record what I had done, and what I hope to upload is -- and we
21  can do the -- deal with this after a break, but I'll mark your
22  CV as Exhibit 2, your prior testimony marked as Exhibit 3.
23  Your rate sheet marked as Exhibit 4, and then your -- the
24  report itself marked as Exhibit 5, but I will get to those
25  hopefully soon, but I have the report, your Rule 26 disclosure

20

1  brought up on the screen, and that contains all of those
2  documents kind of together.
3    A.  You said that was Exhibit 5?
4    Q.  Yeah.  It will ultimately will be Exhibit 5.
5    A.  Okay.
6    Q.  And I apologize for this, but we have had some
7  technical issues at the office over the last couple of days,
8  but what I have marked, or what will be marked as Exhibit 2 is
9  your CV.  And I have that up on the screen right now.  When is
10  the last time that your CV was updated?
11    A.  Well, I received the Professional Excellence Award
12  from the Michigan State Police in January of 2022, so likely
13  around that time or shortly thereafter.
14    Q.  Yeah, and tell me about that.  I saw that referenced
15  in the report, and congratulation on that, but can you just
16  tell me a little bit more about, you know, what you did and
17  the award that you received.
18    A.  So the Michigan State Police detectives were
19  investigating a fatality, possible homicide, which involved a
20  woman that was found in her basement with an orange extension
21  cord tied around her neck, and there were two knots in it.
22  And so the Michigan State Police contacted me as a materials
23  engineer to, essentially, look at the physical evidence and
24  then opine on whether the properties of the extension cord
25  found around her neck were consistent with her having hung

21

1  herself or not.  And so all the work that I did for the
2  Michigan State Police on behalf of Amy Allan was done pro
3  bono.  And then it ultimately resulted in the conviction of
4  her husband for second degree murder.
5      Q.  And so that was not a fire case.  It's a homicide
6  involving, I guess, confirmed murder where this poor woman was
7  hung?
8      A.  Yes.  So I was, essentially, retained as a materials
9  scientist to, you know, explain to the jury the difference
10  between an extension cord and a rope, and then whether an
11  extension cord would actually suspend, you know, the
12  140 pounds that Mrs. Allan weighed at the time, and then what
13  that extension cord, and specifically the knots, would look
14  like had she hung herself.  So it was really more as a
15  materials engineer, you know, to assist the jury in describing
16  the differences both, you know, physically between an
17  extension cord and a rope, and what the appearance of the
18  extension cord would look like had it been used in an actual
19  hanging.
20      Q.  And that's listed on page 3 of your CV; is that
21  right?
22      A.  Yes.  And as I mentioned, I did not charge the
23  Michigan State Police nor the family for any of the work that
24  I performed.
25      Q.  Have you written any additional presentations or

22

1  articles since 2019?
2      A.  I believe I have given some presentations, but the
3  only other article referenced above is the chapter that I
4  wrote in the latest edition of the Fire Protection Handbook on
5  oxidizers.
6      Q.  When you say that you have given presentations in
7  the last -- let's just go with the last two years.  Have you
8  given any presentations that in any way relate to CSST?
9      A.  Yes.
10      Q.  And how many?
11      A.  One.
12      Q.  And tell me about that presentation.
13      A.  Make that two.
14      Q.  Okay.  Tell me about those.  Is it the same
15  presentation, or are they two different presentations?
16      A.  They're different presentations.  The first one I
17  presented, I believe, for three hours at what is called the
18  Michigan Arson School.  And the topic was corrugated stainless
19  steel tubing, I believe, fires, and characteristics of
20  corrugated stainless steel tubing to assist fire investigators
21  with, you know, either making that determination, or at least
22  putting it on their radar.
23      And then the second one is, I believe I gave five
24  hours of training to the Texas State Fire Marshal's Office
25  fire investigators on materials science and gas piping.  And

23

1  so that gas piping not only included CSST, but it also
2  included black iron pipe and included plastic service lines
3  and steel gas mains.  So it was, essentially, the materials
4  science examination of all forms of gas piping, but it did
5  include CSST as well as gas appliance connectors.
6      Q.  And with respect to your -- that second
7  presentation, how was black iron pipe involved with that
8  presentation?
9      A.  Without looking at my presentation slides, I believe
10  the reference I made to black iron pipe was pitting corrosion
11  in a steel main that was outside of a home where the gas from
12  the steel main was allowed to migrate into the home that
13  resulted in an explosion.
14      And then the second one that comes to mind is
15  another residential explosion where we had pretty serious -- I
16  would call it general corrosion to the 1-inch steel gas line.
17  Again, that was outside, but the openings in the black pipe
18  were determined to be post explosion and not pre explosion.
19      Q.  And so in that second -- that residential explosion,
20  I guess you ultimately offered the opinion that the black iron
21  pipe was a victim of the fire, not a cause of it?
22      A.  That's correct.
23      Q.  Are you currently working on any matters involving
24  gas leaks from black iron pipe?
25      A.  Not that come to mind.

24

1      Q.  In the last two years, have you worked on any
2  matters involving gas leaks in black iron pipe?
3      A.  The one with the post-explosion damage to the
4  uniform corrosion to the gas main, I believe that concluded
5  within the last two years.  But since then, none come to mind.
6      Q.  From your -- to your recollection, what was the
7  cause of the fire in that residential explosion?
8      A.  It was, essentially, the accumulation and ignition
9  of unodorized butane during illegal marijuana processing
10  activities inside the same home at the time.
11      Q.  And was there a lawsuit, or was this just an
12  investigation?
13      A.  So, certainly, the Oakland County sheriff's Office
14  was involved to some extent because of the activities, but I
15  was retained by Farm Bureau Insurance that had insured part of
16  the structure.
17      Q.  And was there any litigation involved, or was this a
18  pre-litigation investigation?
19      A.  I believe they ultimately settled.
20      Q.  Do you recall if you were deposed in that matter?
21      A.  The opposing counsel for the plaintiff did not want
22  to pay for my deposition, so no, I was not deposed.
23      Q.  Did you issue a report in that matter?
24      A.  I believe I did, yes.
25      Q.  I assume that there was a report from the opposing

25

1  side that corrosion caused the black iron pipe to fail; is
2  that right?
3      A.  Based on my recollection, I only recall that the
4  fire investigator for the plaintiff did not complete his
5  investigation, and any report he prepared was preliminary and
6  really did not include the results of the laboratory
7  examination, including microscopy of the openings in that
8  black pipe where an alleged leak occurred but was determined
9  to be post explosion.  So his report, I think, was preliminary
10  and incomplete.
11      Q.  Do you recall the name of the investigator?
12      A.  Not off the top of my head, but he was from SEA
13  Limited, I believe, out of Ohio.
14      Q.  Do you recall the name of that lawsuit?
15      A.  I don't recall how to spell the first name of the
16  insured, but the first initial would be L, as in Larry, and
17  then the last name was Krykun, K-R-Y-K-U-N.
18      Q.  And --
19      A.  And that was in Palmer Township, Michigan.
20      Q.  And who was Farm Bureau's insured in that matter?
21      A.  So the specifics of who insured what and how is not
22  obvious to me, but I think there was an insurance policy for
23  the structure, and then there was another insurance policy
24  either for the contents or the occupant.  But I believe Farm
25  Bureau Insurance had some part of the policy with respect to

26

1  the structure.
2      Q.  And so, presumably, you were working on behalf of
3  the homeowner or the premises owner; is that right?
4      A.  Again, I was essentially retained by Farm Bureau to
5  perform an origin and cause investigation.  They may have
6  ultimately denied the claim, but initially I was performing a
7  site investigation and a laboratory examination of evidence
8  from that site.
9      Q.  Got it.  The decedent, was it a homeowner, a gas --
10  renter?
11      A.  So no one died, but two young men who were likely in
12  the act of processing marijuana were seriously injured.  One,
13  I think, may have resulted in a personal amputation of his
14  leg, and the other one, I think, hit his head pretty hard.
15      Q.  I am now at the -- your trial testimony -- and the
16  list of your deposition and trial testimony, again, I'll mark
17  as Exhibit 3.  I'll have to do that after the break.
18      But since I deposed you back in the Williams
19  matter -- and let me just get the date on the record so we can
20  work from there.  So it looks like the last time we talked was
21  May in 2021.  So I just briefly want to go over the testimony
22  that you have offered since that time.  All right?
23      A.  Sure.
24      Q.  So it looks like you have been deposed in three
25  different trials, the first being People vs. James David

27

1  Allan.  Is that the murder case that you worked on pro bono?
2      A.  Yes, that is the murder trial.
3      Q.  And I think I just said that it was three trials,
4  but it looks like there's four, so I apologize for that.  The
5  matter above it, the Farm Bureau of Michigan case, what was
6  that matter about?
7      A.  So the Nikola Dedivanaj was a fraudulent water
8  damage claim.  I was working on behalf of Farm Bureau
9  Insurance.
10      Q.  When you say fraudulent water damage, what was at
11  issue in that matter?
12      A.  So a braided stainless steel water supply line to a
13  bidet was found separated from the barbed fitting, which would
14  not occur as a result of exposure to freezing temperatures,
15  but could be manipulated and separated resulting in the
16  release of water into the structure.
17      Q.  And you were retained by Farm Bureau in that case;
18  is that right?
19      A.  Yes.
20      Q.  The next case, State Farm vs. USA Insulation, what
21  did that matter involve?
22      A.  So I was working on behalf of State Farm for the
23  insured, the Rotts.  And, essentially, this was in support of
24  a fire investigation that occurred shortly after blow-in foam
25  insulation had been installed that then transitioned to

28

1  flaming combustion that resulted in a fire at the Rott home.
2      Q.  And the spray foam, if it was within your opinion,
3  did you have any opinion as to how the spray foam ignited?
4      A.  So it was a combination of not only literature
5  search as well as a review of the technical information for
6  similar two-part spray foams, but also laboratory testing
7  where we were able to, essentially, achieve conditions whereby
8  the foam self-heated and transitioned to the point of flaming
9  combustion in the time frame of the fire that occurred at the
10  Rott home.
11      Q.  And so did I have it correct that you performed your
12  own lab testing with this two-part spray foam in order to get
13  ignition?
14      A.  So we did a series of tests using, like, a faux wall
15  with different thicknesses of the foam application.  We did a
16  variety of different, like, boxes which would simulate
17  improper installation because of the overall thickness and,
18  you know, instrumented with thermocouples to show that you can
19  have the accumulation of heat under those conditions.  And
20  then ultimately we did a 30-inch square box filled with
21  two-part sprayed foam that then transitioned to flaming
22  combustion within two hours after the spray foam was added.
23  So we did a series of tests and collected data with the same
24  foam that was used in the Rott home on the day of the fire.
25      Q.  Understood.  So, in that case, you tested your

29

1  ignition theory to establish that it could happen; is that
2  right?
3      A.  That it could happen with the subject foam that was
4  being used, and it was entirely consistent with existing
5  literature, yes.
6      Q.  The case above it, Salvatore Dinoto v. Farm Bureau,
7  were you retained by Farm Bureau in that case?
8      A.  Yes, and this is another fraudulent water damage
9  claim.
10     Q.  And what opinions did you offer in that case?
11     A.  So based on my investigation and review of the
12  physical evidence from this particular loss site, the plastic
13  nut associated with the toilet water supply line had been
14  physically unthreaded from the shank of the toilet fill valve
15  assembly which then allowed water to flow into the structure.
16     Q.  So very similar to the claim in the prior matter of
17  Nikola -- I'm going to butcher the last name, but that prior
18  matter that we discussed?
19     A.  There were definitely some similarities, yes, but
20  the ultimate alleged failure was different.
21     Q.  I'm going to go down to your deposition testimony.
22  The Barnhart v. Property Owners Insurance matter, do you
23  recall who you worked for in that case?
24     A.  Yes, I was working on behalf of the Barnharts.
25     Q.  And what did that dispute involve?

30

1      A.  So there was an explosion at the Barnhart residence
2  that resulted from the self-loosening of an improperly
3  installed drip leg associated with the furnace in their
4  basement.  So it had been unloosening over time.  And on the
5  day of the incident, it fell from the T in the gas piping to
6  the furnace, and then you had the release and accumulation of
7  natural gas in the home, and then the home exploded, and
8  fortunately, the Barnharts were not home when that occurred.
9      Q.  And what was the ignition source in that matter?
10     A.  I believe, based on my recollection, the most likely
11  ignition source was the pilot light of the gas-fired water
12  heater in the same utility room as the furnace and its gas
13  piping.
14     Q.  The matter above it, Farm Bureau v. DJG Mechanical,
15  I'm assuming that you were retained by Farm Bureau in that
16  matter; is that right?
17     A.  Well, you missed one.  It's another Farm Bureau
18  matter versus TNT Equipment.
19     Q.  Let's go to that one.  Thank you.
20     A.  Okay.
21     Q.  Can you tell me about that case?
22     A.  I believe I was retained by attorneys representing
23  TNT Equipment.  I can't be sure, but this essentially involved
24  the root cause of a -- for lack of a better word -- a
25  melt-through or a blowhole behind an electrical distribution

31

1  panel that then resulted in a fire.
2      Q.  How often -- well, strike that.  Do you know how
3  many current matters you have open for Farm Bureau?
4      A.  I have not counted, but I would say currently five
5  or less.
6      Q.  Back to Farm Bureau v DJG Mechanical, what do you
7  recall about that case?
8      A.  So Mr. Reemer had a ginormous home here in Southeast
9  Michigan, and there was some ongoing renovations that were
10  performed, and the installers of some copper wire supply lines
11  failed to properly insulate them, and they burst and froze and
12  caused significant damage to this ginormous home.
13     Q.  So that's a water damage case; is that right?
14     A.  Yes.
15     Q.  The matter above it, Randy Davis v. Harley-Davidson,
16  who retained you in that matter?
17     A.  So I was working for counsel on behalf of Mr. Davis
18  who was on his Harley-Davidson going down the expressway when
19  a fire erupted between his legs causing him to dump the bike
20  on the side of the road and that resulted in additional
21  significant physical injuries to him.  And so I identified the
22  root cause of the failure of the Harley-Davidson motorcycle
23  that resulted in the release and ignition of gasoline.
24     Q.  And what was your opinion as to what the failure was
25  with the Harley-Davidson motorcycle?

32

1      A.  Sure.  There was a design defect in the fuel line,
2  essentially under the fuel tank.
3      Q.  Maxwell Smith v. Sherwin-Williams, who retained you
4  in that case?
5      A.  I was working for counsel on behalf of Mr. Smith.
6      Q.  And what did that dispute involve?
7      A.  So Mr. Smith had purchased a brand new can of
8  khaki-colored spray paint, went home to his workshop,
9  inadvertently dropped it and it blew up and it punched him in
10  the face.  The can punched him in the face and he had
11  significant orbital injuries.  And so I examined the subject
12  can to arrive at the root case of its failure and his
13  injuries.
14     Q.  And in your opinion, what was the root case of the
15  failure of that can?
16     A.  It was a design defect.
17     Q.  The case above it, Liberty Insurance vs. Titeflex,
18  I'm assuming you were retained by Liberty Insurance; is that
19  right?
20     A.  That's correct.
21     Q.  And do you recall was this a CSST case?
22     A.  This was a CSST case that resulted from improper
23  installation of the FlashShield.
24     Q.  And when you say "improper installation" -- well,
25  was there -- was this a lightning fire or, like, an

33

1  electrical fault fire?
2      A.  Based on my recollection, this was
3  lightning-induced failure, but the failure ultimately
4  occurred because the FlashShield was not properly installed.
5      Q.  And so in that matter, my recollection is that they
6  cut the jacket a little too short, that left a gap between the
7  jacket of the FlashShield and the fitting, and an arc occurred
8  there, and that's where the fire originated; is that right?
9      A.  That's a fair summary of that particular case, yes,
10  but I think they -- you know, you have to include the mesh was
11  not engaged by the nut.  So it wasn't just the jacket.  It was
12  the aluminum mesh was not engaged by the nut that then allowed
13  it to fail as if it were -- if the aluminum mesh was not
14  present.
15      Q.  And so there -- well, did you offer any opinion
16  regarding the design of the FlashShield product?
17      A.  I would have to review my opinions in that case, but
18  I think ultimately, as I do in this and other CSST cases, was
19  to essentially examine the openings in the CSST and determine
20  the root cause as well as contributing factors.  I don't
21  recall specifically having any design opinions in that
22  specific case.
23      Q.  Do you recall if you offered any opinion that the
24  product was improperly installed?
25      A.  I believe so, yes, but I'd have to review my report

34

1  and opinions.
2      Q.  Here you don't offer any opinions regarding the
3  installation of the CSST at the Diel home; is that right?
4      A.  I believe that's correct, yes.
5      Q.  And the CSST at the Diel home was not bonded to the
6  home's grounding electrode; is that correct?
7          MR. CATHCART:  Object to the form.
8          THE WITNESS:  So I would defer to Mr. Kelly about
9      the nature of the bonding and grounding, but I don't
10      recall seeing the bond connection at the outlet or the
11      inlet of the service to the Diel home, that's correct.
12      Q.  (By Mr. Guilmartin)  And so in the Liberty Insurance
13  case, you opined that it was improperly installed and that
14  resulted in this electrical arc.  Is it that you were not
15  retained to look at the installation here and whether or not
16  there was any correlation between the improper installation
17  and the cause of the fire?
18      A.  So there's a lot with respect to installation.  In
19  the Jester case specifically, it was the failure to engage the
20  aluminum mesh under the nut that compromised the integrity of
21  that particular product under lightning strike conditions.
22  So while that is installation related, I didn't opine on the
23  bonding and grounding in that instance.
24      Q.  But in this case, the bonding -- well, would you
25  agree with me that the bonding of CSST is required in order to

35

1  mitigate against electrical arcing events?
2      A.  Based on my review of literature, I don't know that
3  that is a true statement in all cases, but I would certainly
4  defer to Kelly Colwell on the bonding and grounding issues in
5  this case.
6      Q.  The June 2022 matter, In Re: January 24th explosion
7  litigation, do you see that?
8      A.  Yes.
9      Q.  And what does that matter involve?
10      A.  So there was a large explosion in Houston, Texas,
11  that resulted in four fatalities and over $40 million in
12  property damage because of the unmitigated release of
13  propylene gas inside a structure that had definite design
14  issues.  And I was retained as a subject matter expert in
15  metallurgy by a -- I guess it would be like a consortium of
16  insurance companies to investigate that loss.
17      Q.  And so are you on the plaintiff's subrogation side
18  or on the defense side of that matter?
19      A.  The plaintiff's subrogation side.
20      Q.  And what opinions did you ultimately render in that
21  matter?
22      A.  I'd have to review my report for the specifics of my
23  opinions, but essentially the first fuel ignited was a
24  propylene oxygen or propylene air mixture.  There were
25  multiple potential ignition sources inside the structure that

36

1  could ignite that mixture.  And the root cause was essentially
2  the separation of a rubber hose from its fitting that allowed
3  that unmitigated release of propylene into the structure.  I
4  may have had additional opinions about ways that this could
5  have been mitigated by those who distributed the propylene gas
6  but, you know, it was essentially origin and cause and
7  contributing factors as a materials scientist.
8      Q.  The Patricia Allen matter, who retained you in that
9  case?
10      A.  I was retained by counsel for Brewer's, Inc., a
11  defendant.
12      Q.  And what was the nature of your retention in that
13  case?
14      A.  So, Mr. Allen was driving -- as a passenger in his
15  truck down the road when a fragment of a wheel from the Arbor
16  Springs Water Company truck was projectiled through the
17  windshield, and it essentially cut his jugular, and he bled
18  out and died as a result of that incident.  Brewer's, Inc.,
19  was a tow truck company that was actually towing the Arbor
20  Springs Water truck at the time the piece of steel separated
21  from the rim and then was projectiled into the windshield of
22  that vehicle.
23      Q.  In the matter above it, Michigan Municipal League v.
24  Lake State Roofing, who retained you in that case?
25      A.  I was working on behalf of the plaintiff, Michigan

37

1  Municipal League.
2      Q.   And what did that dispute involve?
3      A.   So that is a roof fire, and the most likely cause,
4  based on my investigations as well as laboratory testing, was
5  the ignition of high-surface area fiberboard from a careless
6  discarded cigarette into a bucket.
7      Q.   The matter above it, State Farm v. BSH Home
8  Appliance, I'm assuming that you were retained by State Farm?
9      A.   Yes.
10     Q.   And what opinions did you offer in that case?
11     A.   In the case of State Farm on behalf of Mr. Hayes,
12  this was, I believe, a dishwasher fire.  And I was retained as
13  a metallurgist to perform an examination of electrical
14  artifacts associated with the subject dishwasher and opine on
15  the cause of the damage to those electrical fire -- electrical
16  artifacts.
17     Q.   So this was a fire at an appliance; is that right?
18     A.   Yes.
19     Q.   And specifically what opinions did you offer in that
20  case?
21     A.   That the localized damage to the electrical
22  artifacts from that appliance was a cause of the fire as
23  opposed to a victim.
24     Q.   And how were you able to differentiate the evidence
25  of electrical arcing as a cause of a fire versus being a

38

1  victim of the fire?
2      A.   So the damage to the electrical artifact was very
3  localized, and in comparison with an intact similar connector,
4  the location of, I'll say, the melt separation was consistent
5  with an arc event as opposed to attack by fire or eutectic
6  melting or any other cause of localized damage to an artifact.
7      Q.   Would you agree with me that here at the Diel home
8  that we have evidence of localized arcing events?
9      A.   So I am very familiar and am often retained to
10  characterize damage to electrical conductors from fire scenes
11  as well as damage to corrugated stainless steel tubing and gas
12  appliance connectors from fire scenes.  So, yes, I looked not
13  only at the arc sites to the various copper conductors from
14  the Diels scene, but also the arc site on the subject CSST.
15     Q.   But you would agree with me that there was localized
16  evidence of arcing on the conductors in the area of origin; is
17  that right?
18     A.   Not only in the area of origin, but remote from the
19  area of origin, which supports arc mapping.
20     Q.   And would you agree -- well, in BSH Home Appliance,
21  I'm assuming that it was your opinion that this arcing was a
22  competent ignition source to start the fire; is that right?
23     A.   I was working closely with the electrical engineer
24  that was retained on that fire, so I was participating more in
25  characterizing the damage to the electrical artifact and found

39

1  that the damage was consistent with arcing, and then he had to
2  apply that information in the analysis of the fire involving
3  that appliance.
4      Q.   Okay.  And so it sounds like it was your opinion
5  that there was localized arcing consistent with an arc event
6  versus, I guess, damage caused by the fire; is that right?
7      A.   That's correct.
8      Q.   But certainly the expert that you were working with,
9  the electrical engineer then opined that that arcing event was
10  a competent ignition source; is that right?
11     A.   That's most likely, yes.
12     Q.   And he --
13     A.   He took the data.  Yeah, he took the data that I
14  generated and applied that data in his analysis of the fire
15  scene.
16     Q.   And here we have evidence of multiple arc sites on
17  the electrical conductors; is that right?
18     A.   Not only within the area of origin but remote from
19  the area of origin, that's correct.
20     Q.   And would you agree with me that each of those
21  arcing events is a competent ignition source?
22     A.   Under some conditions, yes.  In this case, no, they
23  are victims of an existing fire.
24     Q.   And so in BSH Home, it was your opinion that those
25  arc events caused a fire, or at least it was the electrical

40

1  engineer's.  But here it's the opposite opinion, your opinion
2  is that the arcs were caused by the fire?
3          MR. CATHCART:  Object to the form.
4          THE WITNESS:  So every analysis I perform is done
5      without bias or influence from previous cases.  And one
6      distinct difference I would make between that BSH Home
7      Appliance matter is that this was a brass connection, not
8      copper conductors.  So there are printed circuit boards.
9      They have, like, various brass fittings for plug-type
10     attachments, and that's where this failure occurred.  So
11     this localized melting was to a brass component as
12     opposed to household electrical, and it was associated
13     with a connection at a printed circuit board in an
14     appliance.  So while arc damage can occur to various
15     artifacts under electrical insults or from exposure to
16     fire, every case where I see any localized melting, I
17     apply the same methodology of failure analysis to
18     determine whether it's a cause or a victim, and whether
19     it's a credible ignition source based on other data from
20     the fire scene.
21     Q.   (By Mr. Guilmartin)  And we'll get into it a bit
22  more later, but the arcs observed at the Diel home, you agree
23  that's evidence of arcing, not evidence of fire damage; is
24  that right?
25     A.   So there are a number of different ways that you can

41

1  have localized damage to electrical conductors from fire
2  scenes, which includes mechanical, chemical, eutectic melting,
3  electrical, high-resistance connection. And so when I examine
4  the damage to any electrical conductor, I apply the same
5  methodology to determine the root case. And then after that
6  root cause, coupled with my familiarity with arc mapping, then
7  you can take the data from that localized melting to determine
8  whether it confirms your area of origin or if it is a
9  competent ignition source for any other materials that are
10 available or not. So it's a culmination of the examination,
11 not only of the physical artifacts, but the environment and
12 the timeline associated with any particular fire, including
13 this one.
14     Q. Dr. Buc, again, we had this issue at your last
15 deposition. I mean, you go off on these tangents, and I would
16 appreciate if you would just answer the question because we
17 are losing a ton of time. I don't mean for this deposition to
18 be very long. I mean, I think I'm asking some questions that
19 are very pointed, and I think, you know, they are open to
20 simple yes or no.
21     So I'm going to ask this as a yes or no question.
22 The evidence of arcing on the electrical conductors at the
23 Diel home, is it -- would you agree with me that it was
24 cause -- that those anomalies on the conductors were caused by
25 arcing?

43

1  water, as opposed to failed from any known metallurgical
2  means.
3      Q. And the matter above it, Privilege Underwriters vs.
4  Omega Flex, that's a CSST case; is that right?
5      A. Correct.
6      Q. And you represent, or you were retained by
7  Privileged Underwriters; is that right?
8      A. Correct.
9      Q. After that deposition in the Block matter, have you
10 done any additional work in that case?
11     A. Not that comes to mind, no.
12     Q. I'm going to go down, and I have a few more
13 questions before, and then we'll take a break.
14     What will be marked as Exhibit 4 is your rate sheet
15 for 2022. Have the rates changed at all for 2023?
16     A. No. While everything else has gone up in price, I
17 have kept my rates the same.
18     Q. I feel your pain there. And so I'm going to go back
19 up, and then we will take a break. But just for the record,
20 after -- when we come back, we'll get into your report. And
21 your report I have marked as Exhibit 5. Why don't we come
22 back at 11:20. Hopefully, I'll have some exhibits ready by
23 then and we can get into your report.
24     A. No problem.
25     MR. GUILMARTIN: Thanks everybody.

42

1      MR. CATHCART: Object to the form.
2      THE WITNESS: Yes.
3      Q. (By Mr. Guilmartin) Okay. Thank you. But it's
4  your opinion that that arcing was not the cause of this fire?
5      A. Correct.
6      Q. The next matter, Crimson Exploration Operating vs.
7  Cudd Pumping Services, what was this matter about?
8      A. So I was retained by counsel for Cudd Pumping
9  Services in regards to the failure of an acid tank at a well
10 site in Midland, Texas, that resulted in the release of a
11 large volume of concentrated hydrochloric acid into the
12 environment.
13     Q. And what opinions did you offer in that matter?
14     A. That the acid tank that was holding the acid at the
15 time had defective coating that allowed that acid to corrode
16 an already compromised floor in the tank at the discharge end
17 of the tank.
18     Q. The matter above it, Latorski v. Meemic Insurance,
19 who retained you in this case?
20     A. So I was working on behalf of Meemic Insurance for
21 what ultimately turned out to be a fraudulent water damage
22 claim.
23     Q. And what opinions did you offer in that case?
24     A. That the valve on the second floor bathroom sink had
25 been manually disassembled, that allowed for the release of

44

1      VIDEOGRAPHER: The time is 10:09 a.m. We are going
2  off the record.
3
4      (Off record, 10:09 a.m. to 10:22 a.m.)
5
6      VIDEOGRAPHER: The time is 10:22 a.m. Back on the
7  record.
8      Q. (By Mr. Guilmartin) Dr. Buc, during the break I was
9  able to pull down the exhibits.
10     Christine, I'm also told that they're uploaded to
11 Lexitas, so I will go through very quickly right now and just
12 kind of put into the record what we have so far.
13     And Dr. Buc, do you see a document on your screen
14 this is your deposition notice?
15     A. Yes.
16     MR. GUILMARTIN: Okay. And just for the record, we
17 are going to mark this as Exhibit 1. Next is your CV.
18 We are going to mark that as Exhibit 2. Next is your
19 deposition and trial testimony. We will mark that as
20 Exhibit 3. Then there is the rate sheet, which we marked
21 as Exhibit 4, and then I have your report, which I'll
22 leave up now, and I have marked this as Exhibit 5.
23
24     (Exhibits 1-5, Documents, marked for
25     identification)

45

1    Q.   (By Mr. Guilmartin)  Dr. Buc, is this your report?
2    A.   Yes.
3    Q.   Does it contain the entirety of the opinions that
4 you will be offering at trial in this case?
5    A.   Unless requested to do additional work, the answer
6 is yes.
7    Q.   And would you agree with me that you have issued no
8 rebuttal report and no supplemental report in this case?
9    A.   Not at this time, but if requested, then I would do
10 so.
11    Q.   The report is dated March 3, 2023; is that right?
12    A.   Correct.
13    Q.   Do you recall if you received Curtis Ozment's report
14 before or after you issued your report?
15    A.   I would have to do that research.  I don't recall.
16    Q.   Okay, second page.  You were retained by Farm
17 Bureau; is that right?
18        MR. CATHCART:  Object to the form.
19        THE WITNESS:  I was retained by Farm Bureau of
20    Oklahoma, that's correct.
21    Q.   (By Mr. Guilmartin)  And with respect to the lab
22 exam of all of the materials that you collected, they have
23 been produced in your file; is that right?
24    A.   Yes.
25    Q.   And then you testified earlier, but you did take

46

1 some notes at that lab exam; is that right?
2    A.   Yes.
3        MR. GUILMARTIN:  And I'll mark those as Exhibit 6.
4    And they run from Bates Number Buc 153 through Buc 162.
5
6        (Exhibit 6, Notes, Buc_153 to Buc_162, marked for
7        identification)
8
9    Q.   (By Mr. Guilmartin)  So Exhibit 6 that I have in
10 front of me, are those your notes?
11    A.   I would clarify those are my handwritten notes
12 during the laboratory examination, but I also include my
13 photographs as well as the laboratory data that was collected
14 during the same lab exam as part of my notes file.
15    Q.   Okay.  And I see, for example, on this first page
16 there is a discussion of the Breckenridge Fire Department
17 report; is that correct?
18    A.   Yes.
19    Q.   Would you agree with me that in the report there is
20 no discussion at all involving the CSST or the fire
21 originating at the CSST; is that right?
22    A.   I am confused by your question.  Can you ask that
23 again?
24    Q.   Yeah.  Did the Breckenridge Fire Department --
25    A.   Oh.

47

1    Q.   -- find that the fire originated at the CSST?
2    A.   I don't think they do that level of detail, so the
3 answer is no.
4    Q.   Do you recall if the Breckenridge Fire Department
5 report references CSST at all?
6    A.   Again, I think it was a very high-level fire
7 department report, but I don't recall them mentioning
8 anything, you know, detailed investigation or CSST.
9    Q.   There is a listing of the various propane
10 appliances.  Where did you get that information from?
11    A.   That information, most likely, came from not only
12 the Diel testimony but also the photographs of the fire scene
13 and the different lengths of CSST that were collected.
14    Q.   And there is a reference to Zillow.  Is it just that
15 you went on Zillow to look at the house?
16    A.   Yes.  I typically look on Zillow for not only the
17 age of the structure, but also the general square footage.
18    Q.   There is a reference to Weather Underground.  What
19 is that?
20    A.   Your cursor is pointing to "Will Rogers World
21 Airport Station in Oklahoma City, Oklahoma.
22    Q.   Right, but what is that?  What is this a reference
23 to?
24    A.   I'm looking at the weather records for the date of
25 the fire.

48

1    Q.   Got it.  And so the data point for the weather
2 report is from a nearby airport?
3    A.   That's correct.  When you type in Enid, it sends you
4 to the Will Rogers World Airport Station.
5    Q.   Got it.  Then there are some notations regarding the
6 deposition of Michael Diel; that right?
7    A.   That's correct.
8    Q.   There is a notation regarding Ballard Plumbing.  Do
9 you know if anybody has spoken to anybody at Ballard Plumbing?
10    A.   I have not.
11    Q.   Starting at page 6 of your notes, these are the
12 notes from the lab exam; is that right?
13    A.   Yes.  Just for clarification if you scroll up, do
14 you have my notes from the deposition of Sondra?
15    Q.   I do.  It's right here.
16    A.   Okay, sorry.  Go ahead.
17    Q.   No, we have them, sorry.  But starting at page 6,
18 these are the notes from the lab exam?
19    A.   That's correct.
20    Q.   And I see that there's photos in the notes.  Are
21 those photos that you put in after the lab exam?  How do you
22 go about, I guess, writing the notes and getting the photos in
23 your notes?
24    A.   I use an iPad, and the software that I use is called
25 Note Taker HD, and that allows me, with an Apple pen, not only

49

1  to write words and sentences, but also to import photographs
2  that I take with the iPad.
3      Q.  Got it.  So these are photos and notes that you're
4  pulling together contemporaneously at the lab exam?
5      A.  In general, yes.
6      Q.  When you say "in general," how do I have it wrong?
7      A.  I may sit at the airport or on the airplane the same
8  day as the lab exam, and kind of refine my notes.  So
9  contemporaneous is probably the same day as opposed to the
10 same minute.
11     Q.  Got it.  Page 7, there is a photograph.  There is a
12 notation regarding "very small hole."  Do you see that?
13     A.  Yes.
14     Q.  Okay.  And would you agree with me then that this
15 was a very small hole?
16     A.  I have seen a range in areas of openings in CSST.  I
17 would consider this on the smaller side, yes.
18     Q.  And then there are some arrows to arc sites.  Do you
19 see that?
20     A.  Yes.
21     Q.  And above this, it says, "Electrical through area of
22 origin."  So you kind of put together the conductors in the
23 CSST, and this is generally how it was configured in the attic
24 space of the Diel home; is that right?
25     A.  In general, yes.  I would defer to Mr. Colwell's

50

1  photographs, but yes.
2      Q.  And the two arc sites that you're noting, would you
3  agree with me that you are conceding that these are arc sites?
4      A.  Yes.
5      Q.  And what type of electrical conductors am I looking
6  at?
7      A.  So the solid conductors are part of Romax, which may
8  be three or four wires, and there were a total of four runs of
9  Romex through the area.  The picture below shows it a little
10 more spread out.
11     Q.  Got it.  So the two, I guess, groupings of
12 conductors on the top photographs, those are both sets of
13 Romex wires; is that right?
14     A.  There may be some coax cables and CAT 5 cable
15 coupled therein.  But in general, yes, you're looking at solid
16 copper conductors from Romex.
17     Q.  And so we have arc sites both -- we have arc sites
18 in close proximity to the hole in the CSST; is that right?
19     A.  Sure.
20     Q.  And at least with respect to Exponent, Exponent's
21 opinion is that the arcing was from these Romex wires to the
22 CSST during the course of this building fire; is that right?
23     A.  That's my understanding of their report, yes.
24     Q.  And it's Kelly's opinion that these arc sites that
25 are near the CSST were not involved with the initial arcing

51

1  event that started this fire; is that right?
2      A.  I would agree with that, yes.
3      Q.  And I think that's your opinion, too; is that
4  correct?
5      A.  We reached that opinion independently, but yes, I
6  don't agree with that -- or I don't disagree with that.
7      Q.  And so it's your opinion that the CSST was energized
8  by this lightning strike, and then there was arcing to a coax
9  cable and perhaps something else; is that right?
10     A.  The "something else" is the release and ignition of
11 propane gas that then started a fire in this area, yes.
12     Q.  And in your scenario, how did the CSST get energized
13 in the first instance?
14     A.  So there is a recorded direct strike and evidence of
15 an attachment point from lightning to the same structure.
16     Q.  But how did it make its way from the attachment
17 point on the gable to the -- and then energize the CSST?
18     A.  So we know that lightning, when it enters a
19 structure, takes multiple paths to ground.  I can't say in
20 this particular instance I can draw that exact line, but there
21 is definitely the correlation of a direct lightning strike
22 from an attachment point to the roof as well as the STRIKEnet
23 report and this opening in the CSST.  But I can't say -- I
24 can't draw the line by which this particular lightning strike
25 in its multiple paths to ground interacted with the CSST.

52

1      Q.  But we do know that the household electrical system
2  was energized by this lightning strike; is that correct?
3      A.  The house was energized at the time, yes.
4      Q.  Yeah, and there's damage to the electrical system
5  outside the area of origin; is that right?
6      A.  Yes.  I recall there is one, I think, receptacle
7  that showed some kind of damage, but it didn't result in a
8  propagating fire.
9      Q.  Okay.  So we have independent evidence, other than
10 the fire, that the electrical system was energized as a result
11 of the lightning strike; is that correct?
12     A.  At least in that particular circuit, yes.
13     Q.  What -- in your opinion what is the opposing
14 electrode for this arcing event from the CSST?
15     A.  Well, I look at, essentially, you know, the overall
16 appearance of the opening, both before and after cleaning, the
17 size, the number, the location, various artifacts in the area,
18 and then the detailed chemistry by EDS as well as ICP.  And in
19 this particular case, I think the most likely corresponding
20 electrode is the aluminum shield from one of the coax cables.
21     Q.  Was there anything else involved in this arcing
22 event?
23     A.  Just the lightning event.
24     Q.  Your report had some notation regarding, I think,
25 elevated levels of zinc; is that right?

53

1    A.  Well, I consider them elevated.  Obviously, from the
2  ICP of the base metal chemistry of the subject CSST, there is
3  no zinc.  And I believe in only one of the 14 spectra
4  collected by EDS, there was one indication of zinc.
5    Q.  The coax cable, that's the opposing electrode, what
6  did that run to and from?
7    A.  I didn't trace it, per se, but the pre-removal
8  photographs show it's in intimate contact with the three runs
9  of CSST in the area.
10    Q.  As are the Romex wires that are depicted in the
11  photo that I have up on the screen; is that right?
12    A.  Sure, but the on-site photographs show, essentially,
13  the aluminum right at the pink zip ties where the opening in
14  the CSST was identified by leak testing before anything was
15  removed.
16    Q.  In the photos at the scene, the hole is on the
17  opposite side as the coax cables; is that right?
18    A.  They're in the same location, but yes, it appears
19  that the opening is perhaps oriented, I would say, you know,
20  not strictly up, but not in contact with the aluminum at that
21  location.
22    Q.  Right.  And so the assumption is that during the
23  course of the fire, things moved a little bit; is that right?
24    A.  It could be from the application of water from
25  Mr. Diel during the fire.  It could have been, you know,

54

1  during the fire investigation process.  But the photographs
2  as, you know, best we can tell from that evidence collection
3  and documentation shows aluminum, essentially, in the area of
4  the opening.
5    Q.  But you would agree with me within that same area
6  there is evidence of arcing on the Romex wires; is that right?
7    A.  Yes.
8    Q.  Top of page 9 you note that there is radiant barrier
9  in the attic space.  Do you see that?
10    A.  Yes, that was part of the evidence collected.
11    Q.  And it says, "Arc sites downstream."  What do you
12  mean by that?
13    A.  So the diagram, in general, essentially shows we saw
14  multiple arc sites in the area where the CSST was perforated,
15  but we also saw an arc site remote from that, which supports
16  arc mapping.
17    Q.  And when you say that it "supports arc mapping,"
18  what do you mean by that?
19    A.  So arc mapping is, essentially, identified by NFPA
20  921 in the Patterns chapter where you can look at damage to
21  energized conductors to establish an area of origin as well as
22  flame spread.
23    Q.  Right, but -- well, wouldn't arc mapping also
24  support Exponent's opinion if an arc occurred down low, where
25  my cursor is, the fire spreads up the radiant barrier, then

55

1  consumes the electrical wires resulting in arcing between the
2  electrical components and the CSST.  You disagree that arc
3  mapping supports Exponent's version of events as well?
4    A.  Right.  Yes, I disagree with their -- not only that
5  ignition scenario but the use of arc mapping in that respect
6  as well.
7    Q.  And then why would arc mapping not support their
8  position?
9    A.  Because I don't think that whole sequence of events
10  you just described, which is their ignition scenario, were to
11  have occurred in four minutes or less.
12    Q.  The radiant barrier, it's combustible; is that
13  right?
14    A.  There are components of the radiant barrier that are
15  combustible, but the fiberglass is not.
16    Q.  And in your test that you ran in the lab, when you
17  had ignition at the radiant barrier, how quickly did it burn?
18    A.  Are you referring to the demonstration we performed
19  at Integrity?
20    Q.  Correct.
21    A.  I don't know that I recorded a rate.
22    Q.  Would you agree with me that in that test, the
23  radiant barrier was readily combustible?
24    A.  Under the conditions of the test with that ignition
25  source, sure.

56

1    Q.  And the ignition source in that test was an arching
2  event; is that right?
3    A.  I don't know if it was an arcing event or a torch or
4  lighter.  I would have to review those -- that data.
5    Q.  You don't recall if there was an arcing event at the
6  clip and that allowed the fire to propagate along the radiant
7  barrier?
8    MR. CATHCART:  Object to form.
9    THE WITNESS:  Again, I don't recall the
10    demonstration we performed in the lab, but I thought the
11    ignition source was an open flame.
12    Q.  (By Mr. Guilmartin)  So going back to the arc
13  mapping, it sounds like you disagree that arc mapping supports
14  their position because you disagree with the predicate, which
15  is that this was the first arc; is that right?
16    A.  Correct.
17    Q.  Okay.  You write, "Corresponding electrode not known
18  with certainty."  Why do you write that?
19    A.  That was at the time of the laboratory examination,
20  and then subsequent to my review of all additional data, the
21  most likely corresponding electrode based on the chemistry is
22  aluminum based, and that would likely come from the shield of
23  the coax cable as opposed to the radiant barrier.
24    Q.  Just looking at your diagram at page 9, just so that
25  we're on the same page, it's your and Integrity's and Ozment's

57

1  opinion that arcing event occurred up more toward, I guess,
2  the peak of the roof, and then the fire spread down and caused
3  this arc site down below?
4      A.   That's correct.
5      Q.   And up here where the CSST is, under your theory and
6  Integrity's theory, you would have a gas burning fire at the
7  start of this fire in this area; is that right?
8      A.   Propane gas fueled fire, that's correct.
9      Q.   Would you agree with me generally that a propane
10  fueled fire burns more quickly than a fire without propane?
11     A.   That depends on orientation, ventilation, fuel load,
12  so I can't say I agree with that statement in a blank way.
13  But it's definitely the constant source of fuel for a fire
14  that can then spread to other nearby combustible materials,
15  sure.
16     Q.   Did you look at the photos of this attic space, and
17  is it your opinion that the area of most damage is where the
18  hole in the CSST was found?
19     A.   In general, yes.
20     Q.   When you say "in general," what do you mean by that?
21     A.   There's a lot of consumption to, essentially, the
22  wood framing in the area where that hole in the CSST is
23  located.
24     Q.   And is it your opinion that that is the greatest
25  damage or the most consumed wood is in that area?

58

1      A.   It appeared to be, yes.
2      Q.   And you weren't at the joint scene inspection; is
3  that correct?
4      A.   I was not at the joint site inspection, but I did
5  review all of Integrity's photographs.
6      Q.   Are you aware of any fully-consumed joist in any
7  other area below the hole in the CSST?
8      A.   Not without reviewing the photographs; however, the
9  fast response of Mr. Diel in applying water through an opening
10  in the roof, I don't know that I would expect to have complete
11  consumption at least in this area, but I'd have to review the
12  photographs for any consumption elsewhere.
13     Q.   But if there's a fire burning and there is a -- he
14  didn't turn off the valves, there would be constant -- under
15  your theory, there would be constant flow of gas in that area;
16  is that right?
17     A.   And fire, yes, but he is still applying water, which
18  is going to reach some of the -- you know, the wood framing
19  and lumber, yes.
20     Q.   How could he have applied any water to the area
21  where the hole in the CSST was?
22     A.   He was, essentially, applying water through an
23  opening in the roof where he saw smoke.
24     Q.   Right, but that's on the other side of the barrier
25  where the CSST ran through; is that right?

59

1      A.   I'd have to look at the relative location of things,
2  but my recollection from his deposition is he was applying
3  water to the roof in the area where he saw smoke.
4      Q.   Right.  But that area isn't where the hole in the
5  CSST was located; is that right?
6      A.   If that's the case, that's where he was applying
7  water.
8      Q.   Are you aware of any fully-consumed wood joist where
9  the -- I guess we'll call it the lone arc site is?
10     A.   Based on my review of photographs, no, I did not
11  notice that, but I did notice that here is, you know, intact
12  jacket on the conductor in close proximity.  But without
13  reviewing the photographs, it does not come to mind.  And it
14  seems that I have the words "unburned wood framing" right
15  there.
16     Q.   Yeah.  Would it change your opinions at all if there
17  was a fully-consumed wood joist where you put "unburned wood
18  framing"?
19     A.   No.
20     Q.   Why not?
21     A.   Because the fire spread in that location and could
22  involve other combustible materials.
23     Q.   But there is no gas down here; is that right?
24     A.   So the gas is going to deflect off some of the wood
25  framing in the area, but I would say that you definitely have

60

1  constant fire up in the area of the CSST.  And I can't give
2  you a dimension that is accurate, but there is definitely
3  going to be constant fire in the CSST, which is not far from
4  that location.  But again --
5      Q.   How far is it?
6      A.   I would say that that's probably on the order of
7  3 feet or less.
8      Q.   And so it's your opinion that the gas fire was
9  somehow fueling a fire down where the lone arc site is?
10     A.   Well, no.  We have other combustible materials in
11  the area that are going to spread fire, but the origin of the
12  fire is at the gas from the CSST that continues to be fueled.
13  But my diagram also notes that you still have just melted
14  aluminum as well as unburned wood framing at that location,
15  the general location of that arc site.
16     Q.   Okay.  Would you agree with me that none of the wood
17  joists in the vicinity of the CSST were fully consumed?
18     A.   Based on my recollection and review of the
19  photographs, I think that's correct.
20     Q.   They were charred; is that right?
21     A.   Some of them are heavily charred with mass loss,
22  yes.
23     Q.   But the mass loss certainly didn't fully consume any
24  portions of those wood joist members; is that right?
25     A.   Sure.

61

1    Q.   And the fire department reported very quickly to
2  this fire; is that right?
3    A.   Let's see.  Based on my notes on page 1, it says
4  they received the call at 22:48 or 10:48 p.m.  They were out
5  or responding, in the process of responding, at 10:54 and they
6  arrived on scene at 10:57, but the call to 911 was only four
7  minutes after the lightning strike.
8    Q.   Right.  So from the time of the lightning strike
9  until the time the fire department reported to the home, we're
10 talking less than an hour; is that right?
11   A.   We're talking less than 20 minutes.
12   Q.   Less than 20 minutes.  Have you seen prior testing
13 performed by Integrity related to consumption of wood members
14 in a CSST fire?
15   A.   Testing as in their laboratory?
16   Q.   Correct.
17   A.   I seem to recall from the Williams matter that a,
18 you know, test bed with insulation and wood frames was
19 created, but I'd have to review that laboratory demonstration
20 in detail.
21   Q.   In that video, I think they let it burn for about an
22 hour and a half; is that right?
23   A.   That sounds right.
24   Q.   I'm going to go back to your report.  You write that
25 "In addition to the single, round hole in the subject CSST and

62

1  multiple arc sites to conductors in and near the area of
2  origin."  Do you see that?
3    A.   Yes.
4    Q.   And where is your area of origin?
5    A.   It's the area of most burning and observations from
6  witness statements in that attic space.
7
8        (Exhibit 7, Photograph, marked for identification)
9
10   Q.   (By Mr. Guilmartin)  And so I pulled up a photo that
11 I marked as Exhibit 7.  And your area of origin would be at
12 the top where my cursor is and where the CSST runs; is that
13 right?
14   A.   That's probably not the best photograph, but I
15 understand where you're at.
16   Q.   Got it.  And then there's a can light that is down
17 below, and then the arc site, per your notes, is about the top
18 of where this ladder is; is that right?
19   A.   That seems fair, yes.
20   Q.   Okay.  And then you put in your notations that
21 there's unburned wood members; is that right?
22   A.   Yes.
23   Q.   Okay.  And I want to point your attention -- and I
24 can maybe try to zoom in a little bit here.  Now earlier you
25 testified that you were unaware of fully consumed wood in

63

1  Exponent's area of origin.  Now looking at this photo, do you
2  see where my cursor is?
3    A.   No.  I'm not sure where you went.  I'm looking at
4  like -- okay.  Now I know where you are.
5    Q.   Okay.  And do you see any fully burned wood members
6  in Exponent's area of origin?
7    A.   I can't tell from that photograph, but I see a lot
8  of intact aluminum foil, and I also see very little damage to
9  the wood framing that is running towards me in that
10 photograph.
11   Q.   Right.  And there would be insulation that was
12 packed in under or in this area; is that right?
13   A.   Yeah.  And if you actually scroll that photo up, you
14 can kind of see two layers of noncombustible -- other way.
15 There's the two layers of noncombustible insulation in that
16 same space.
17   Q.   Right.  And this wood member that is fully consumed,
18 it runs above the support frame; is that right?
19   A.   Sure.
20   Q.   Okay.  And until now, you were unaware of this fully
21 consumed wood joist; is that right?
22   A.   If that's the case, fine, but it doesn't change my
23 opinions.
24   Q.   So even though there is evidence of arcing in this
25 area, and even though there's a fully consumed wood joist in

64

1  this area, that doesn't change your opinion?
2    A.   That's correct.
3    Q.   And in the prior matter involving the appliance, you
4  testified that a sole arc can cause a fire; is that right?
5    A.   Again, as I described, my role in that case was to
6  characterize the localized damage to that electrical artifact,
7  and then the electrical engineer used that data in his data
8  analysis.
9    Q.   Right.  But here you have localized arcing in this
10 area; is that correct?
11   A.   From flame spread, contacting, and energized
12 conductor.
13   Q.   But you have -- yes or no, there is localized arcing
14 in the area where Exponent places the area of origin?
15   A.   Sure.  I wouldn't disagree with the characterization
16 of damage to that conductor as an arc site.
17   Q.   Okay.  So if the fire department reported in 20
18 minutes, and we don't have a gas-fed fire down in this area,
19 if this isn't the area of origin, how do we get a fully
20 consumed joist down below where Ozment places the area of
21 origin?
22   A.   So we likely have a flame spread from the
23 involvement of the plastic-backed aluminum radiant barrier
24 material that continued to drop down and continued to burn.
25   Q.   And so it's your opinion that that's a greater fuel

65

1  source than a propane fire that begins at the inception of
2  this fire?
3      A.  I didn't characterize it as greater, but it's
4  definitely a fuel load that can continue to burn once ignited
5  and spread fire.
6      Q.  Can you explain to me and explain to the jury how,
7  if you have a propane fire that's burning from the inception
8  of this fire, how do you have greater damage, significantly
9  greater damage, done where Exponent has the area of origin?
10     A.  It may be the duration at which that was allowed to
11 burn, but if you have any --
12     Q.  Do you have any information -- do you have any
13 information that the fire department allowed that area to
14 burn?
15     A.  Well --
16        MR. CATHCART:  Object to form.
17        THE WITNESS:  -- again, if their focus is on
18     extinguishing the attic fire, they're probably going to
19     put water where they see smoke.  But you have evidence of
20     combustible materials that continue to burn at that
21     location during the course of the fire.
22     Q.  (By Mr. Guilmartin)  So it's your opinion that this
23 fully consumed joist was caused by dropdown of, I guess, the
24 radiant barrier?
25     A.  Of just flame spread from the area of origin that

66

1  then also caused the insulation on the conductor to be
2  compromised and an arc to occur.
3      Q.  Okay.  So in this 20 minutes or 30 minutes, we have
4  fire starting at the CSST, some dropdown onto the conductor,
5  arcing at that conductor, and enough time to fully consume
6  this joist?
7      A.  Yes.
8      Q.  Do you have any information as to how long it would
9  take if we placed a radiant barrier, or some radiant barrier
10 on this joist and we ignite it, how long would it take to
11 fully consume that joist?
12     A.  I don't have that information in front of me.
13     Q.  You write in the first paragraph that you relied on
14 data gathered during the fire investigation.  Do you see that?
15     A.  Yes.
16     Q.  What data are you referring to?
17     A.  That's going to be essentially the inventory of the
18 appliances, the routing of the CSST, the propane tank that was
19 on the property, the STRIKEnet report, which is there listed,
20 the photographs and the measurements that occurred, you know,
21 where the CSST was found to have a perforation from leak
22 testing.
23     Q.  Don't you think it would be relevant to your
24 analysis to have been told that there was a fully consumed
25 joist where there was an arc site?

67

1      A.  I mean, not -- I mean, it's information in and of
2  itself, but I look at the totality of the data.
3      Q.  But --
4      A.  And in this case --
5      Q.  -- the totality of the data would include that fully
6  consumed joist; is that right?
7      A.  Sure, but that's not -- I mean, it was exposed to
8  fire, so that's not unexpected.
9      Q.  But that data point, you were unaware of that until
10 today's deposition; is that right?
11     A.  I reviewed all the photographs from the area of
12 origin, and I don't know that I noted that location, but it is
13 not consistent with the short timeline of this fire.
14     Q.  But it's consistent with the dropdown from a fire
15 above?
16     A.  Yes.  Fire does spread and continues to burn.
17     Q.  I may have asked you this at a prior deposition, but
18 you have three patents.  What are those for?
19     A.  So one of them is related to a magnetic refrigerant.
20 Another one is related to -- they're on my wall.  I'd have to
21 read them.
22     Q.  It's all right if you don't specifically recall, but
23 anything fire or fire prevention related?
24     A.  Well, I did design a passive barrier to prevent burn
25 injuries to children for shallow glass front fireplaces, but I

68

1  released my rights in order for the manufacturer to implement
2  that safety device.
3      Q.  I understand.
4      A.  I believe there was also a potential patent
5  application for, I would say, a noncombustible fire barrier
6  for ammonium absorption refrigerators that I may have been
7  identified as a co-assignee, but I don't know if that ever
8  came to fruition in terms of a patent.
9      Q.  Methodology, you write that you performed your
10 methodology consistent with NFPA 921; is that right?
11     A.  Correct.
12     Q.  Okay.  But would you agree with me again that you
13 didn't perform a complete NFPA 921 analysis?
14     A.  Again, I would defer you to my opinions, which
15 essentially identify an origin and cause, which is based on my
16 review of the data collected, the laboratory examination data,
17 and my analysis of that to arrive at those opinions, which
18 are, part in parcel, origin and cause in nature.
19     Q.  But per NFPA 921, you would agree with me that you
20 have to rule out all potential causes of a fire before making
21 a determination as to what caused a fire?
22     A.  Sure.  And I do avoid that kind of confirmation bias
23 before the work is even started.
24     Q.  But here nowhere in your report did you rule out the
25 radiant barrier as the cause of this fire; is that correct?

69

1    A.   I did note it in the area of origin, but the
2  description of it being the first material ignited is likely
3  not written there.
4    Q.   On page 4 of your report, there is a discussion
5  concerning some of the work that had been performed after this
6  home -- after the CSST had been installed; is that right?
7    A.   The second paragraph, yes, yes.
8    Q.   And I'll do my best to kind of highlight where I'm
9  going for you.  And a water heater was replaced, and also a
10  generator was added; is that right?
11    A.   That's my understanding, yes.
12    Q.   And do you know when the water heater was replaced?
13    A.   I don't see that in my notes of the deposition
14  transcripts of either Mr. or Mrs. Diel, so I would look at
15  Integrity's photographs of the name plate on the water heaters
16  to make that determination.
17    Q.   And with respect to installing or replacing the
18  water heater, in order to replace a gas-fired water heater,
19  you would have to connect the -- disconnect the existing gas
20  line and then reconnect it to the new water heater; is that
21  right?
22    A.   Sure.
23    Q.   And would you agree with me that the CSST fed this
24  water heater?
25    A.   One length of CSST did, yes.

70

1    Q.   And do you have any opinion as to when the installer
2  did that, if they had an obligation to install the water
3  heater consistent with NFPA 54?
4    A.   I don't know when, and that goes beyond the scope of
5  my retainer.
6    Q.   Do you have any knowledge that the -- when this
7  individual replaced the water heater if they complied with the
8  National Fuel Gas Code?
9    A.   I didn't perform that research in this case.
10    Q.   And here the CSST -- well, starting in 2009, the
11  National Fuel Gas Code required that CSST have an independent
12  bond; is that correct?
13    A.   I'm sorry, what was the date?
14    Q.   2009.
15    A.   Okay.  I don't have reason to disagree with that.
16    Q.   And to your knowledge, the CSST at the Diel home did
17  not have an indirect bond; is that -- or did not have a direct
18  bond --
19    A.   Direct bond.
20    Q.   -- is that right?
21    A.   Sure, that was my observation, yes.  But I would
22  defer to Kelly on the changes that occur over time.
23    Q.   Would you agree with me that the Diel home was not
24  compliant with the National Fuel Gas Code as of 2009?
25    A.   Again, I would defer to Kelly for his observations

71

1  with respect to the bonding and grounding and the applicable
2  codes at the time it was installed and any repairs were made.
3    Q.   The last paragraph of page 4, you write, "In other
4  locations a radiant barrier system was affixed to the attic
5  walls."  Do you see that?
6    A.   Yes.
7    Q.   And when you say "other locations," would you agree
8  with me that there was radiant barrier within the area of
9  origin?
10    A.   It was generally below the location where the CSST
11  and conductors were running, yes.
12    Q.   I'm going to go to page 5.  And on page 5, earlier
13  we had talked about Mr. Diel trying to fight the fire with
14  his -- with the hose; is that right?
15    A.   From his deposition testimony, yes.
16    Q.   Okay.  And at the top of page 5, there's two photos.
17  The photo on the left, would you agree with me that the CSST
18  in this photo -- you can't see where it is because it's behind
19  the wall where my cursor is?
20    A.   Correct.
21    Q.   And so if Mr. Diel is trying to put the fire out
22  from above this area, he's putting the fire -- or the water on
23  the area where my cursor is; correct?
24    A.   I honestly can't tell you where the water is
25  flowing, but it would be flowing down.

72

1    Q.   Okay.  The photo on the right, the circle, that's
2  where you're placing the area of origin; is that right?
3    A.   The figure note says, "The general location of the
4  perforation in the CSST is circled within the area of origin,"
5  yes.
6    Q.   And then -- but down below where my cursor is, and
7  we can kind of see where the ladder is, again, that's where
8  Exponent places the area of origin; is that right?
9    A.   According to them, yes.
10    Q.   And then between where they have the area of origin
11  and where you have the area of origin, there would have been
12  radiant barrier that is stapled along this wall; is that
13  correct?
14    A.   Correct, and you can see the remains of aluminum at
15  the bottom, yes.
16    Q.   And would you agree that that radiant barrier
17  between where Exponent has the area of origin and where you
18  have the area of origin that it's consumed?
19    A.   Sure.
20    Q.   Paragraph 2, you note the size of the hole.  Do you
21  have any information as to the coulombs of charge necessary to
22  cause this size of a hole?
23    A.   On the order of 0.12 coulomb or higher.
24    Q.   Okay.  When you say "or higher," what do you mean by
25  that?

73

1    A.   My understanding is the minimum charge required to
2  create an opening in TracPipe CSST with the jacket is on the
3  order of 0.12 coulomb.  And a higher charge will, obviously,
4  create an opening as well.
5    Q.   Have you seen Johnie Spruiell's analysis with
6  respect to the coulombs of charge necessary to cause this
7  hole?
8    A.   I'm aware of those calculations being done.  I don't
9  know what his results were.
10    Q.   Okay.  And would you agree with me that in order to
11  support your opinion and all of the plaintiffs' opinions that
12  fire -- that the first fuel ignited is the gas escaping the
13  CSST, that the arcing event would need to simultaneously
14  ignite escaping gas?
15    A.   And/or the combustible yellow jacket in the same
16  location, yes.
17    Q.   What testing are you aware of that ignition can
18  result at an arcing event that results in a hole that is
19  .35 millimeters?
20    A.   So based upon my experience with other CSST cases,
21  it is the confirmed presence of the melt and the melting
22  temperature of stainless steel which is sufficient to ignite
23  the escaping gas, whether it's propane or natural gas.
24    Q.   Right, and that's a general principle that the
25  arcing event, that that temperature exceeds the ignition

74

1  temperature necessary for propane; is that right?
2    A.   It's not a general principle.  It's the properties
3  of the material involved and the temperature required to melt
4  it, yes.  So it's more of a scientific as opposed to a general
5  principle.
6    Q.   And Exponent has done some testing to show that this
7  arc -- that you don't get ignition when this arc event occurs
8  because there's too much velocity and you have to have mixture
9  of oxygen and propane in order to get ignition; is that right?
10    A.   So, apparently, Exponent cannot achieve ignition
11  with escaping gas from CSST, but others clearly have.
12    Q.   And the others that have, that would include
13  Integrity; is that right?
14    A.   I believe Integrity, UL, The Warren Group, as well
15  as the late Tom Eagar's laboratory, have all achieved ignition
16  of escaping gas from perforations in CSST.
17    Q.   And would you agree with me that even in those tests
18  that they don't always get ignition?
19    A.   So the conditions of ignition, you know, can vary,
20  but any obstruction in the gas stream as it escapes can
21  facilitate the mixing and ignition.
22    Q.   And, for example, the Integrity testing in the
23  Williams matter, more often than that, they couldn't get
24  ignition; is that right?
25    A.   I don't recall the specifics of the testing

75

1  performed, but I do recall that there was a small opening, and
2  it was under insulation, which facilitated the fusion of gas
3  and sustained burning.
4    Q.   Are you aware of any -- you listed this testing, the
5  Warren, the Dr. Eagar, the Integrity, are you aware of any of
6  them performing arc ignition testing with CSST using less than
7  one coulomb of charge?
8    A.   I would have to review that world of data, and I
9  have not to date.
10    Q.   And so as you sit here today, you're not aware of
11  any testing that establishes that an arc caused by less than
12  one coulomb of charge can result in ignition; is that right?
13    A.   Again, there's a lot of data.  I haven't reduced it
14  to answer that question at this time.  It's possible.
15    Q.   So, as of right now, you're aware of none; is that
16  correct?
17    A.   I would have --
18        MR. CATHCART:  Object to form.
19        THE WITNESS:  -- to do the additional research.
20    Q.   (By Mr. Guilmartin)  Do you know that Exponent used
21  1,000 percent of the charge necessary to cause the hole in the
22  Diel home in their ignition test?
23    A.   I'm kind of confused as to what Exponent testing
24  you're referring to.
25    Q.   The Integrity test.  Are you aware that Integrity,

76

1  in their ignition test, used 1,000 percent the coulombs of
2  charge that was necessary to cause the hole in the Diel home?
3    A.   Again, I don't know that we were looking for the
4  minimum charge required to create the opening, but to
5  essentially establish an opening and what follows.  So I don't
6  know if the purpose of the test was to do that specifically,
7  so they did what was necessary to create an opening.
8    Q.   So you're aware of no tests that show that the
9  charge that caused this hole specifically can result in
10  ignition?
11    A.   Again, I'm looking --
12        MR. CATHCART:  Object to the form.
13        THE WITNESS:  Again, I'm looking at the positive
14    evidence of definite melting which, given the melting
15    temperature of stainless steel fire, exceeds ignition
16    temperature of propane gas.  So it doesn't matter to me
17    the number of coulombs, but it's the coulombs, whatever
18    they were, were sufficient to melt stainless steel, which
19    has high enough temperatures to ignite the escaping gas.
20    Q.   (By Mr. Guilmartin)  Name one test performed by
21  anybody in the world that an arc caused by a charge of less
22  than half a coulomb can result in ignition?
23    A.   I'd have to do that additional research to answer
24  that question.  It doesn't mean it can't happen, as it did in
25  this case.

77

1    Q.  But here it's the plaintiff's burden to establish
2  that this specific arc resulted in ignition.  Can you tell me
3  one test that you're aware of that confirms that this is
4  possible?
5    A.  Again, I'm looking at the presence of molten
6  stainless steel, which has significantly higher melting
7  temperatures than the ignition temperature of propane.  That's
8  all I need.
9    Q.  Can you tell me if there's one test that establishes
10  that this is possible?
11    A.  We have the physical data from this case, but I'd
12  have to do additional research in order to answer that
13  question.
14    Q.  Why didn't Integrity just do the test in this case
15  if they were going to offer this opinion?
16    MR. CATHCART:  Object to the form.
17    THE WITNESS:  Ask Integrity.
18    Q.  (By Mr. Guilmartin)  Did you ask Integrity to
19  perform the test to confirm that this arc can result in
20  ignition?
21    A.  No.
22    Q.  Paragraph 3 at the bottom of page 5, this is where
23  you discuss the EDS work that was performed at the lab; is
24  that right?
25    A.  Correct.

78

1    Q.  The footnote --
2    A.  Can you -- I'm sorry.  I have to indicate that my
3  battery is low.  I just want to confirm I am plugged in.  Give
4  me one second.
5    Q.  Sure.
6    A.  I apologize.  Please proceed.
7    Q.  Yeah, no problem at all.  The footnote, "Previous
8  laboratory studies have shown that the metals from the arc
9  event with corresponding electrodes can deposit on the jacket,
10  which is then consumed."  What you're saying here is that
11  sometimes when there's an arc event, that the presence of the
12  jacket may result in, I guess, a lack of material transfer.
13  Is that the point you're making here?
14    A.  In some cases, yes.  But what I'm referring to
15  specifically with that footnote is when we forced an arc to
16  occur in the laboratory between CSST and galvanized steel
17  ductwork, and then we looked at the chemistry and the size of
18  the opening from those various tests.
19    Q.  And in those tests, you actually -- there was a
20  jacket, but you put a hole in the jacket where the arcing
21  event occurred; is that correct?
22    A.  Most likely, but I don't recall the specifics of the
23  case other than it was a galvanized sheet steel ductwork that
24  we were arcing against, or with.
25    Q.  And in those instances, there was an arc event, but

79

1  there wasn't a transfer of material?
2    A.  So we didn't have an ensuing fire, so we kind of
3  looked at what was present around the melt opening and what
4  was present on the jacket, but we were specifically looking
5  for zinc.
6    Q.  Bottom of page 6, this is where you're noting the
7  arc sites, the copper conductors near the CSST and where --
8  Exponent's area of origin; is that correct?
9    A.  Yes.
10    Q.  And I know that you don't believe that those arcs
11  caused this fire, but these arc sites are potential ignition
12  sources; is that correct?
13    A.  Under some conditions, yes.
14    Q.  And then so per NFPA 921, you would have to
15  establish that each of these arc sites was not the cause of
16  the fire in order to rule them out as a cause; is that right?
17    A.  Correct.
18    MR. CATHCART:  Object to the form.
19    THE WITNESS:  And that was done.
20    Q.  (By Mr. Guilmartin)  Page 7, you discuss the
21  temperature of the arc and the ignition temperature for
22  propane; is that right?
23    A.  Yes.
24    Q.  And this analysis, though, does not consider the
25  velocity to have the gas, nor does it consider the necessary

80

1  mixing of oxygen and propane, in order to have ignition; is
2  that right?
3    A.  Well, it goes without saying we didn't have an
4  explosion, so we know we didn't have the release of gas that
5  was not ignited and accumulated resulting in an explosion.  We
6  had the occurrence of fire very quickly, which is all very
7  consistent with the release of propane into space that
8  contains oxygen and a competent ignition source.
9    Q.  The sentence that I have highlighted in the second
10  paragraph of your engineering analysis, "In this case the
11  short timeline between the lightning strike, the size and
12  shape of the hole, and the absence of copper in the melt
13  confirms the arc event that caused the hole in the CSST was
14  lightning induced."
15    A.  Yes.
16    Q.  The absence of copper, will you agree with me that
17  you don't always get transfer of copper when there's arcing
18  between CSST and a Romex copper electrode?
19    A.  I don't know that I agree with that statement
20  100 percent.  It depends.
21    Q.  And what does it depend on?
22    A.  The person doing the analyses, where the analyses
23  are occurring, if they're taking into consideration the base
24  metal chemistry of CSST contains copper.  So you have to look
25  at concentration.  And then there are definitely other

81

1  published studies which show the presence of significant
2  amounts of copper present in the melt when it's the result of
3  intimate contact between an energized conductor and CSST
4  during an ensuing fire.  So there's a lot of evidence that
5  supports that.
6      If this were the result of contact between an
7  intimate energized conductor and CSST during an existing fire,
8  which is not supported by the timeline, then we would
9  definitely expect to see some copper in excess of the base
10 metal chemistry in the area of the melt.
11     Q.   Okay.  But in those -- well, so you would agree with
12 me that there are some analyses that show that there is
13 transfer of the copper, and others show that sometimes there
14 isn't; is that right?
15     A.   Well, I would -- for example, in the report by
16 Morris, he says no copper was found.  I don't see the
17 corresponding analyses.  He just points to an appendix that
18 doesn't contain any chemistry data, so I can't take his word
19 for it.  But then if you go to any previous instance where
20 Exponent actually did any EDS analysis, they're not looking at
21 the entire melt opening.  They're choosing spots and assuming
22 they're going to capture that location of copper, and they're
23 completely disregarding that there's small amounts of copper
24 in the base metal chemistry of CSST to begin with.  So, in the
25 case of Morris' statement and his reference to his appendix,

82

1  there is no data there to support his statement whatsoever, so
2  I'm not going to agree with it based on any work that Exponent
3  has done.
4      Q.   You just criticized their use of EDS in the picking
5  of points.  Isn't that what you did in this case?
6      A.   No.  In fact, we did dot mapping.  And dot mapping
7  essentially looks at the chemistry around the entire opening.
8  And the two dot maps that were collected, none of it shows the
9  presence of copper.
10     Q.   Are you aware of any EDS analysis of holes caused by
11 contact between a Romex wire and CSST that are less than one
12 coulomb of charge where you have transfer of copper?
13     A.   I would have to do that additional research.  I
14 don't know, but definitely The Warren Group performed some
15 testing where conductors were in intimate contact with CSST
16 during an existing fire, and they noted the -- I believe it
17 was the visible observation of copper after those tests.  But
18 again, in reviewing Exponent's report and their reference to
19 Appendix C, there was no data to analyze to support that
20 statement.
21     Q.   And The Warren Group testing, when they were doing
22 the testing, do you know if they were getting bigger or
23 smaller holes than the hole observed here?
24     A.   I'd have to review that paper in detail, but I
25 believe they were quantifying the number of holes as opposed

83

1  to the size.  So did a hole occur, yes or no.  And then if it
2  did, how many.  And then I don't recall if they described the
3  size of the openings, but I know they selected a handful of
4  them and said that the transfer of copper from the conductor
5  was either visible -- but they did do that analysis.  I just
6  don't recall specifically if they discussed the size.
7      Q.   So if we take Exponent's theory that this hole was
8  caused by a fire burning and then the Romex coming into
9  contact with the CSST, it would have to be very low on the
10 waveform of -- it would have to be very low on the waveform;
11 is that right --
12     A.   Sure.
13     Q.   -- according to coulombs of charge?
14     A.   I haven't done that analysis, but you have to have
15 intimate contact between the CSST and the Romex for that to
16 occur, and an existing fire.
17     Q.   Right.
18     A.   And I don't see that occurring in this short
19 timeline of this particular fire.
20     Q.   But if we take that as true, the hole, the size
21 would be dependent on where on the waveform --
22     A.   The event occurred.
23     Q.   -- the arc occurs?
24     A.   Sure.
25     Q.   Right.  So if this is on the lower end of the

84

1  waveform, are you aware of any studies that show that when you
2  have a lower waveform arc that you see this material transfer?
3      A.   I have only seen from my recollection is that kind
4  of analysis performed with the size of an arc site on
5  conductors only, meaning -- like so do you get a notch?  Do
6  you get a severed?  Do you get, like, a decent notch based in
7  where on the waveform that arc event occurs?  I can't say
8  sitting here that I have seen that research done with CSST.
9      Q.   Yeah, and this may be something I should discuss
10 further, but just in my mind, you know, I think, well, if
11 there is a lower charge transfer for the arc, there would be
12 less likelihood of material transfer.  Does that not make
13 sense?
14     A.   Well, the melting temperature of copper is even
15 lower than the melting temperature of stainless steel.  So I
16 would think if you have temperature charge sufficient to melt
17 stainless steel, you're definitely going to have sufficient
18 energy to melt and transfer some copper.  But, again, I don't
19 think I have seen that particular study, or I have to do that
20 research.
21     Q.   So the paragraph on page 8 that I'm highlighting,
22 this is your arc mapping analysis; is that right?
23     A.   That is my analysis of all the data gathered from
24 this particular fire scene according to the scientific method
25 to arrive at the conclusion.

85

1    Q.  But there is no discussion of the radiant barrier;
2  is that correct?
3    A.  In that paragraph, no.
4    Q.  And there is no discussion of the fully consumed
5  joist in this analysis.  Why is there no discussion of that?
6    A.  Because wood burns during fires.  And in that area
7  we can have fire spread, which it did from the area of the
8  opening in the CSST.
9    Q.  But isn't it relevant to consider the area where you
10  have the most damage to wood members when you're doing a
11  causation analysis?
12    A.  I think you have to look at all of the data.  So
13  it's the totality of the evidence, not only the fuel load, but
14  the effects of ventilation and orientation and thermal inertia
15  and time.
16    MR. GUILMARTIN:  Why don't we take 10 minutes,
17  and -- I mean, I'll leave it up to everybody.  I don't
18  think that I have more than a half hour left.  So if we
19  take 10, we can finish up around, you know, 1:10 my time.
20  But if folks are, like, itching to get lunch, I'm happy
21  to take a break, too.
22    MR. CATHCART:  Let's take 10, but then finish up.
23    MR. GUILMARTIN:  All right.
24    THE WITNESS:  Okay.  See you in 10 minutes.
25    VIDEOGRAPHER:  The time is 11:32 a.m.  Going off the

86

1  record.
2
3    (Off record, 11:32 a.m. to 11:44 a.m.)
4
5    VIDEOGRAPHER:  The time is 11:44 a.m.  Back on the
6  record.
7    Q.  (By Mr. Guilmartin)  Dr. Buc, I only have a little
8  more for you.  I'm going to pull up what I have marked as
9  Exhibit 8.  Do you see this document?
10    A.  Yes.
11
12    (Exhibit 8, ICP Analysis, marked for
13    identification)
14
15    Q.  (By Mr. Guilmartin)  And this is just the ICP
16  analysis of the CSST that you sent out to RTI; is that right?
17    A.  Yes.
18    Q.  Okay.  And this was done specific for this case?
19    A.  Yes.  I apologize, but it looks like you have two
20  identical -- if you scroll down, it looks like that's -- that
21  may be identical.
22    Q.  Yeah.  And so, did you run the same piece of CSST
23  twice or --
24    A.  No.
25    Q.  -- are there multiple samples?

87

1    A.  It appears to me that you're -- let's just look
2  at -- copper is 0.241 if you scroll up.
3    Q.  Yep.
4    A.  All of the way.  0. -- it's the same report.  It's
5  produced twice.
6    Q.  Okay.  Is there another report that's out there?
7    A.  What do you mean?
8    Q.  Like, was there just one test, one ICP analysis run,
9  or were there two in this case?
10    A.  My recollection is there was only one, but I have
11  been maintaining a database for --
12    Q.  Got it.
13    A.  -- many years, but I believe there was only one
14  sample in this case that was collected and analyzed.
15    Q.  Got it.  All right.  So this is just on the CSST
16  that was sent to RTI, and there is only one analysis
17  performed?
18    A.  Correct.
19    Q.  Got it.
20
21    (Exhibit 9, Williams Article, marked for
22    identification)
23
24    Q.  (By Mr. Guilmartin)  Exhibit 9, this is one of your
25  articles that you relied on in Williams, "Method to

88

1  Characterize Damage to Conductors From Fire Scenes."  And in
2  Williams, you were kind of relying on this paper to establish
3  that what Exponent was saying was an arc isn't an arc at all.
4  But here you agree with Exponent that there is an arc.
5    A.  Yes.  There were multiple arc sites, yes.
6    Q.  Now, what is arc through char?
7    A.  Essentially the conductors, while energized, are
8  surrounded by plastic.  And when that plastic is exposed to
9  heat and/or fire, it starts to decompose and that plastic
10  becomes conductive when it's a char, and then you can have
11  current pass through that, and then you're essentially
12  shorting internally.
13    Q.  And are you aware of any way to distinguish arcs
14  caused by arc through char versus arcs caused as a result of a
15  fire that is developing and causing a typical arc?
16    A.  So you have to start at where the arc is occurring
17  because if it's midstream, there is no reason for an arc to
18  occur midstream pre-fire.  If you're going to have an arc
19  location in any electrical circuit, it's more likely to occur
20  either if a nail impacted it or a staple or it's at a
21  connection.  But usually when you have an arc site midstream,
22  that's from attack by fire because there is no reason for an
23  arc to occur midstream otherwise, but for attack from heat
24  and/or fire or if it's pinched under a staple or a nail or
25  anything like that.  But, historically, you can't look at an

89

1  arc site whether it's cause versus victim.  You have to look
2  at the totality of the data.
3      Q.  Okay.  So it's your opinion that we can't look at
4  these arcs and tell whether or not it was arc through char or
5  what Exponent is saying that was consumed in the fire, then we
6  have arcing occur?
7      A.  Again, they are all midstream --
8      Q.  But there is --
9      A.  -- so we don't have -- I know, but you have to look
10 at there's -- you know, unless we had a nail at one location
11 or a staple, you know, at one location.  But when you look at
12 the totality of the conductors and their arc sites, they are
13 all midstream, and that's all consistent with it occurring,
14 you know, from the application of heat and/or fire causing the
15 plastic to degrade, and then you have arcing through char.
16     Q.  But the arc, the kind of lone arc, the lonely arc
17 down at the bottom, that was where this wood joist was, but
18 the wood joist is gone; is that right?
19     A.  And that same arc can occur from the spread of fire,
20 so it supports the spread of fire.
21     Q.  Right, but we don't know if there was -- if it was
22 stapled on or -- we don't know how it was affixed to that, if
23 at all, affixed to that wood joist; is that right?
24     A.  I haven't done that research, but usually staples
25 survive, or you can look at the frequency of stapling to the

91

1  Usually it blows the fuse, so, you know, it travels along the
2  conductor, gets into the equipment, and then it blows the
3  fuse, or it causes other damage, like, to printed circuit
4  boards.  It doesn't necessarily start a fire, but my
5  experience with lightning-induced damage to electronic
6  devices and appliances is usually in the appliance or, you
7  know, in this case at the receptacle, but I'm not so sure
8  about midstream.
9      Q.  Would you agree with the following statement,
10 "Lightning in and of itself has long been recognized as a
11 potential natural and sufficient cause of a fire"?
12     A.  In some cases.
13     Q.  Okay.  What would you agree with in that statement?
14     A.  I mean, we have -- you know, lightning has been
15 around for a long time, and the lightning phenomenon has been
16 around a long time, and there have been studies how it impacts
17 electronic devices and appliances.  But it has a different
18 effect on black iron pipe than it does CSST and some forms of
19 radiant barrier and, you know, localized damage to just roofs.
20 But, again, I don't know what data is being kept by the
21 National Fire Protection Association about lightning strike
22 data that is not reported.
23     Q.  So the sentence that I read you, that's from -- it's
24 the opening line --
25     A.  Sure.

90

1  left or to the right to determine, you know, whether a staple
2  could have been there.  But if we were to -- if we had a
3  hypothesis about a staple, then you would look for the
4  transfer of either iron to the conductor or copper to the
5  staple, if you find it, to support a staple was the cause of
6  that arc site.
7      Q.  And this concept regarding the mid-run arc, would
8  you agree with me that that doesn't apply when we're dealing
9  with an extremely high-voltage lightning strike?
10     A.  Again, I would defer to Kelly where that's most
11 likely to manifest itself, either at a connection or plug
12 blade or a ground pin.  But my experience with arc sites
13 midstream are typically from attack by heat and/or fire,
14 unless you have chafing.  But chafing is usually associated
15 with, like, vehicles, and that's not this.
16     Q.  Right.  But, you know, earlier you talked about the
17 location of the arc, and how that is relevant.
18     A.  Yeah.
19     Q.  When we have a high-voltage lightning strike,
20 that's -- that concept doesn't apply to a high-voltage
21 lightning strike; is that right?
22     A.  I would defer to Kelly in answering where a
23 high-voltage lightning strike would have the most impact on a
24 conductor running through a home.  I mean, I have seen
25 lightning strike damage to electronic devices and appliances.

92

1      Q.  -- of what I have marked as Exhibit 10, a case study
2  of a radiant barrier system.
3
4          (Exhibit 10, Case Study, marked for identification)
5
6      Q.  (By Mr. Guilmartin)  I only have a couple of
7  questions on this because we talked about it a little bit.  I
8  am going to go down before your conclusion.  Earlier we talked
9  about the testing that Exponent -- I'm going to mix them up
10 the entire time, and I know they probably will both hate me
11 for it, but I'm highlighting a paragraph regarding Integrity's
12 testing, and it says, "In our testing of radiant barrier
13 system products, video recordings showed fires occurred at the
14 vent channel after the electrical arc."  Do you see that?
15     A.  Yes.
16     Q.  And so earlier there was kind of a confusion as to
17 whether or not the fires that were being generated in the lab
18 were caused by, you know, like a butane lighter or an
19 electrical arc.  But at least this sentence suggests that
20 they're creating an electrical arc to start a fire at the
21 radiant barrier?
22     A.  So for specific types of radiant barrier that were
23 not present in the Diel home.  So I was referencing in the
24 laboratory examination of evidence from the Diel home that
25 included the radiant barrier.  I thought we had done an

93

1  ignition test with an open flame, a non-arc site.  But this
2  paper describes other radiant barrier material unlike the Diel
3  radiant barrier that was tested in the laboratory using a
4  high-voltage current.  And I think we may not have disclosed the
5  manufacturers in this particular paper for obvious reasons,
6  but my recollection and my observations of the radiant barrier
7  from the Diel home was not part of this study in this
8  publication.
9      Q.   Yeah.  I'm just -- but the mechanism to ignite the
10  radiant barrier was an arc at the vent channel where this clip
11  is; right?
12     A.   It's not at the vent channel.  It's between panels
13  of radiant barrier, which is like a thin layer of foil on a
14  board backing, and then you use these, like, steel H clips to
15  kind of, you know, piece those all together.  That's not what
16  is in the Diel home.
17     Q.   Right.
18     A.   The Diel home is a different form altogether.
19     Q.   But the Diel home had staples, and arcing between
20  the radiant barrier and the staple would, essentially, be the
21  same concept as arcing to the clip.  Am I missing something?
22     A.   Yeah, I don't think you can say that with certainty.
23  You would have to have the physical evidence of the staple to
24  support that.  And the size of these clips in this particular
25  paragraph, I mean, they're fairly large.  Maybe they are like

94

1  an inch by an inch, whereas a staple is a very small object.
2  So I can't say that I agree with that statement for the
3  radiant barrier that existed in the Diel home and the way it
4  was attached to the wood framing.
5      Q.   I'm going to read into the record the next sentence.
6  "Based on field observations, elimination of other ignition
7  sources, laboratory testing and data, engineering literature
8  and the combustion of particulate aluminum, the minimum
9  conditions for ignition of the polystyrene foam are met when
10  radiant barrier materials become involved in lightning strike
11  discharge to ground."
12         I'm not going to ask you if I read that right
13  because I know I messed up a couple of things there.  But
14  would you agree with me that one of the conclusions of this
15  paper is that arcing at radiant barriers can result in
16  ignition?
17     A.   Some forms of radiant barrier, yes.  And
18  specifically the installation is a contributing factor.
19     Q.   In Williams, you were retained by an insurance
20  company, State Farm; is that right?
21     A.   I believe that to be the case, yes.
22     Q.   And you have worked or you have been retained by
23  State Farm in other matters; is that right?
24     A.   I have, both locally and in Texas, yes.
25     Q.   And you have worked with State Farm on some CSST

95

1  matters; is that right?
2      A.   Yes.
3
4          (Exhibit 11, Paterson Decision, marked for
5          identification)
6
7      Q.   (By Mr. Guilmartin)  What I have marked as
8  Exhibit 11 is a ruling on a motion to preclude and a motion
9  for summary judgment from the District Court of Connecticut.
10  Have you seen this order before?
11     A.   No.
12     Q.   Okay.  And it's relatively recent.  Do you see that
13  it was issued on March 28, 2022?
14     A.   Yes.
15     Q.   And so I'm going to go down.  I guess I can start --
16     A.   Yeah, I would like to read that.  So is there a way
17  that I can read that?  Can you share it with me?
18     Q.   Read it -- I'm sorry.
19     A.   In its entirety.
20     Q.   Like right now?
21     A.   I mean, I'd like to.
22     Q.   I mean, I can get it to you.  I mean, we can send
23  you the exhibits.  I'm just going ask you some questions
24  involving admissions that State Farm made in the Paterson
25  case.

96

1      A.   I'm not familiar with the Paterson -- I know, but
2  I'm not familiar with the Paterson case.  So without reading
3  the entire document, I kind of hesitate to answer a question,
4  you know, in a vacuum.
5      Q.   We can try it, and if you're -- if it's going to be,
6  you know, your position that, you know, you can't respond,
7  that's fine.  But do you agree or disagree with the following
8  statement, "What is not disputed is that TracPipe can be
9  installed approximately 75 percent faster than traditional
10  black iron pipe, making it far less expensive"?
11     A.   I have never timed it.
12     Q.   Would you agree or disagree with the statement,
13  "Another benefit to TracPipe is that because it can flex and
14  bend without breaking, it is less prone to leaking during a
15  flood, earthquake, tornado, or other similar event"?
16     A.   Again, I think if an earthquake were to compromise
17  your home, you have bigger problems to worry about than a leak
18  from your TracPipe.  But, I mean, I don't dispute it's
19  flexible, but we're not talking about a flood, earthquake,
20  tornado, or other similar event in the Diel matter, so it's
21  not really relevant.
22     Q.   If you can, yes or no on this one, do you agree or
23  disagree with this statement, "CSST products and TracPipe in
24  particular have been independently tested and found to be a
25  suitable distribution method of gas within a structure and are

97

1  recognized by all 50 states and the National Model Fuel Gas
2  Code as an approved gas piping system"?
3      A.  I can't agree with that statement without reading
4  the entire document.
5      Q.  Are you aware of any state that -- well, the
6  National Model Fuel Gas Code approves CSST; is that right?
7      A.  In some cases, yes.  But, again, I mean, you should
8  look to the National State Fire Marshals Association for their
9  comment on whether it's suitable or not.  And I would also
10  look to Lubbock, Texas, to determine whether it's suitable or
11  not.  So aside from that, I'm not going to agree with that
12  statement.
13      Q.  Do you agree or disagree that the design and
14  installation guide must be used in conjunction with state and
15  local building codes and that in the absence of local codes,
16  installation must be in accordance with the current edition of
17  the National Fuel Gas Code?
18      A.  Only in general.
19      Q.  Do you agree or disagree that TracPipe must only be
20  installed by a qualified person who has been trained or
21  otherwise qualified through the TracPipe Gas Piping
22  Installation Program?
23      A.  There could be historical qualifications to that.
24      Q.  And what do you mean by that?
25      A.  I know that the qualified person has to be trained,

98

1  but historically I don't know if that's always been the case,
2  which I think it has been.  But, again, that's my general
3  understanding for this product.
4      Q.  Do you know whether or not the installer was
5  certified or trained to install CSST?
6      A.  Everywhere, or are you being specific to the Diel
7  case?
8      Q.  The installer at the Diel home.
9      A.  So based on my understanding, it performed reliably
10  for two decades.  And so had it been installed improperly in
11  terms of the fittings and how it was routed, that's one thing.
12  But it performed reliably for two decades until the house was
13  struck by lightning and it failed.  So if you look at the
14  totality of the data with respect to its age and installation,
15  it's not like we had, you know, a failure with chafing or any
16  other installation-related issue.  I know that there is a
17  direct bonding question, which I'll defer to Kelly about.  But
18  if you look at a product that is supposed to, you know, exist
19  for the entire duration of the home, like electrical
20  conductors, this one didn't fail until the house was struck by
21  lightning, but it was only a matter of time.
22      Q.  Okay.  But the CSST was not bonded, and the bonding
23  is meant to mitigate against what happened; is that right?
24      A.  Only under some conditions, but that's not an
25  absolute certainty as far as I know.

99

1      Q.  But here you yourself admit that there is a very
2  small hole; is that right?
3      A.  It doesn't take a big one to create a fire hazard.
4  Any hole, any size, once it releases gas creates a hazardous
5  condition of fire or explosion.
6      Q.  Right.  But would you agree with me that you have no
7  information to support an opinion that bonding would not have
8  prevented this transfer of .13 coulombs of charge?
9      A.  I would defer to Kelly on where the lightning
10  strikes and the impedance of various conductors in the area.
11  But, in my opinion, the presence of even a small hole creates
12  a hazardous condition.
13      Q.  But that's not my question.  My question is wouldn't
14  the bonding have prevented this small hole?
15      A.  Not in all cases.
16      Q.  But you have -- well, are you aware of whether or
17  not the bonding in this instance would have mitigated enough
18  to prevent this .13 coulomb-sized hole?
19      A.  Again, I would defer to Kelly, but I'd just say it's
20  possible, but not the next lightning strike.
21      Q.  But it's possible that it would prevent this
22  lightning strike?
23      A.  So I would defer to an article published by
24  Professor Eagar on a number of simulations he performed to
25  evaluate the efficacy of direct bonding for various lightning

100

1  strikes and where they attach to the home.  So I don't think
2  it's a one-answer question.  I think you need to look at, you
3  know, what is available for review.
4      Q.  I'm going to go back to the Paterson decision.  Do
5  you agree or disagree with the statement, "Bonding is
6  effective at reducing the risk of an arcing event because it
7  reduces the voltage difference between the TracPipe and other
8  metal structures to below the difference required to initiate
9  an arc"?
10      A.  In some cases, but not in all.
11      Q.  Would you agree or disagree with the statement,
12  "Bonding of the type described in the guide is required to
13  significantly reduce the likelihood of arcing in the event of
14  a lightning strike"?
15      A.  My understanding is it can also increase the
16  likelihood under some conditions.
17      Q.  So you don't agree with that statement?
18      A.  Yeah, I'd like to read the whole opinion.  I don't
19  like looking at sentences, you know, just for what it's worth.
20      Q.  Okay.  One more question on this.  Do you agree or
21  disagree with the statement, "Further, even if the bonding
22  does not reduce the voltage enough to prevent an arc entirely,
23  it reduces the risk that an arc will cause a hole in the
24  TracPipe"?
25      A.  Which is not required for black iron pipe.  So I

101

1   don't care what bonding can or can't do when black iron pipe
2   would not behave the same way under the same conditions.
3       Q.   Yeah, but black iron pipe -- I mean, it's a
4   different product.  Black iron pipe requires pipe dope, and
5   it's a different product.
6       A.   Yeah, but it's leak-free forever.  I mean --
7       Q.   Except an explosion that kills five people in the
8   presentation that you performed?
9       A.   Yeah.  I don't know what you're talking about, but
10  black iron pipe would not require, you know, bonding to reduce
11  the voltage under any condition to prevent a tiny hole or
12  otherwise that would release gas into the confined space of a
13  home.
14      Q.   I'm not going to have anything further.  I do -- I
15  thank you for your time, as always.  I'm getting quicker and
16  quicker.  So that was done in about three hours.  So unless
17  Bill -- do you have any questions?
18      MR. CATHCART:  I just have a couple.
19      MR. GUILMARTIN:  Okay.  Sorry about that.  Have at
20  it.
21
22      CROSS-EXAMINATION BY MR. CATHCART:
23
24      Q.   Ms. Buc, in your testimony you're referring to a
25  number of cases that you had been retained by or testified on

102

1   behalf of Farm Bureau; is that correct?
2       A.   Yes.
3       Q.   Was that Farm Bureau of Michigan?
4       A.   Yes.
5       Q.   Have you ever, in the past, done any work for
6   Oklahoma Farm Bureau Mutual Insurance Company?
7       A.   Not to my knowledge beyond this case, no, sir.
8       Q.   Okay.  That's all I have.  Thank you very much.
9   Read and sign.
10      A.   Have a great day everybody.
11      VIDEOGRAPHER:  It's 12:09 p.m., we're going off the
12  record.
13
14      (Deposition concluded at 12:09 p.m.)
15
16
17
18
19
20
21
22
23
24
25

103

1              CERTIFICATE OF COURT REPORTER
2
3       I, Christine E. Borrelli, Registered Merit Reporter
4   and Certified Court Reporter, a Notary Public, do certify that
5   the deposition of ELIZABETH C. BUC, Ph.D., PE, CFI, taken on
6   Thursday, May 11, 2023, was stenographically reported by me;
7   that the witness provided satisfactory evidence of
8   identification, before being sworn by me; that the transcript
9   produced by me is a true and accurate record of the
10  proceedings; that I am neither counsel for, related to, nor
11  employed by any of the parties to the above action; and
12  further that I am not a relative or employee of any attorney
13  or counsel employed by the parties thereto, nor financially or
14  otherwise interested in the outcome of the action.
15
16
17  _____
18                          Christine E. Borrelli
19                          Stenographic Reporter
20
21
22
23
24
25

104

1              SIGNATURE PAGE/ERRATA SHEET
2
    WITNESS:  ELIZABETH C. BUC, Ph.D., PE, CFI
3
    CASE:   OKLAHOMA FARM BUREAU MUTUAL INSURANCE COMPANY AS
4           SUBROGEE OF MICHAEL DIEL vs. OMEGA FLEX, INC.
5
6   PAGE    LINE          CHANGE OR CORRECTION AND REASON
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16
17      I, ELIZABETH C. BUC, Ph.D., PE, CFI, have read the
18  transcript of my deposition taken Thursday, May 11, 2023,
19  except for any corrections or changes noted above, I hereby
20  subscribe to the transcript as an accurate record of the
21  statements made by me.
22      Signed under the pains and penalties of perjury.
23
24  _____    DATE:_____
    Elizabeth C. Buc, Ph.D., PE, CFI
25

**$**

**$40**  35:11

**0**

**0**  87:4

**0.12**  72:23 73:3

**0.241**  87:2

**1**

**1**  5:21,23 44:17 61:3

**1,000**  75:21 76:1

**1-5**  44:24

**1-inch**  23:16

**10**  85:16,19,22,24 92:1,4

**100**  80:20

**10:09**  44:1,4

**10:22**  44:4,6

**10:48**  61:4

**10:54**  61:5

**10:57**  61:6

**11**  4:1 95:4,8

**11:20**  43:22

**11:32**  85:25 86:3

**11:44**  86:3,5

**12:09**  102:11,14

**13**  99:8,18

**14**  53:3

**140**  21:12

**153**  46:4

**162**  46:4

**1:10**  85:19

**2**

**2**  19:22 20:8 44:18 72:20

**20**  61:11,12 64:17 66:3

**2009**  70:10,14,24

**2019**  22:1

**2021**  26:21

**2022**  14:11 20:12 35:6 43:15 95:13

**2023**  4:1 8:2 43:15 45:11

**22:48**  61:4

**24th**  35:6

**26**  8:2 19:25

**28**  95:13

**3**

**3**  5:24 19:22 21:20 26:17 44:20 45:11
60:7 77:22

**30**  66:3

**30-inch**  28:20

**304**  12:2 13:11

**33025**  5:2

**35**  73:19

**4**

**4**  19:23 43:14 44:21 69:4 71:3

**5**

**5**  19:24 20:3,4 43:21 44:22 50:14
71:12,16 77:22

**50**  97:1

**54**  70:3

**6**

**6**  46:3,6,9 48:11,17 79:6

**7**

**7**  49:11 62:8,11 79:20

**75**  96:9

**8**

**8**  84:21 86:9,12

**9**

**9**  54:8 56:24 87:21,24

**911**  61:6

**921**  17:16 54:20 68:10,13,19 79:14

**9:01**  4:2

**A**

**a.m.**  44:1,4,6 85:25 86:3,5

**ability**  6:3

**absence**  80:12,16 97:15

**absolute**  98:25

**absorption**  68:6

**access**  5:8

**accordance**  97:16

**accumulated**  80:5

**accumulation**  24:8 28:19 30:6

**accurate**  60:2

**achieve**  28:7 74:10

**achieved**  74:15

**acid**  42:9,11,14,15

**act**  26:12

**activities**  24:10,14

**actual**  21:18

**added**  28:22 69:10

**addition**  61:25

**additional**  11:8 19:16 21:25 31:20
36:4 43:10 45:5 56:20 75:19 76:23
77:12 82:13

**admissions**  95:24

**admit**  99:1

**advance**  6:18

**affixed**  16:17 71:4 89:22,23

**age**  47:17 98:14

**agree**  9:2 14:18 15:23 16:12 17:1,15
19:6 34:25 38:7,15,20 39:20 40:22
41:23 45:7 46:19 49:14 50:3 51:2,6
54:5 55:22 57:9,12 60:16 68:12,19
69:23 70:23 71:7,17 72:16 73:10
74:17 80:16,19 81:11 82:2 88:4 90:8

91:9,13 94:2,14 96:7,12,22 97:3,11, 13,19 99:6 100:5,11,17,20

**ahead** 48:16

**air** 35:24

**airplane** 49:7

**airport** 47:21 48:2,4 49:7

**Allan** 21:2,12 27:1

**alleged** 25:8 29:20

**Allen** 36:8,14

**allowed** 23:12 29:15 33:12 36:2 42:15,25 56:6 65:10,13

**altogether** 93:18

**aluminum** 10:11,23 11:3 12:4 17:3 33:12,13 34:20 52:20 53:13,20 54:3 56:22 60:14 63:8 64:23 72:14 94:8

**ammonium** 68:6

**amounts** 10:9,11 81:2,23

**amputation** 26:13

**Amy** 21:2

**analyses** 10:25 11:8 80:22 81:12,17

**analysis** 10:14,20 11:24 12:24 18:15,22 19:6 39:2,14 40:4,17 64:8 66:24 68:13,17 73:5 79:24 80:10 81:20 82:10 83:5,14 84:4,22,23 85:5, 11 86:12,16 87:8,16

**analyze** 82:19

**analyzed** 14:4 87:14

**and/or** 17:14 73:15 88:9,24 89:14 90:13

**anomalies** 41:24

**answering** 90:22

**apologize** 20:6 27:4 78:6 86:19

**apparently** 74:10

**appearance** 21:17 52:16

**appearances** 4:7

**appeared** 58:1

**appears** 53:18 87:1

**appendix** 81:17,25 82:19

**Apple** 48:25

**appliance** 23:5 37:8,17,22 38:12,20 39:3 40:7,14 64:3 91:6

**appliances** 47:10 66:18 90:25 91:6, 17

**applicable** 71:1

**application** 28:15 53:24 68:5 89:14

**applied** 39:14 58:20

**apply** 39:2 40:17 41:4 90:8,20

**applying** 58:9,17,22 59:2,6

**approved** 97:2

**approves** 97:6

**approximately** 4:2 96:9

**Arbor** 36:15,19

**arc** 33:7 34:14 38:5,13,14,19 39:5,16, 25 40:14 41:6 49:18 50:2,3,17,24 54:11,14,15,16,17,19,23,24 55:2,5,7 56:12,13,15 57:3 59:9 60:9,15 62:1, 17 64:4,16 66:2,25 74:7 75:6,11 76:21 77:2,19 78:8,11,15,25 79:7,11, 15,21 80:13 83:23 84:2,4,7,11,22 88:3,4,5,6,14,15,16,17,18,21,23 89:1, 4,12,16,19 90:6,7,12,17 92:14,19,20 93:10 100:9,22,23

**arching** 56:1

**arcing** 15:25 35:1 37:25 38:8,16,21 39:1,5,9,21 40:23 41:22,25 42:4 50:21,25 51:8 52:14,21 54:6 55:1 56:3,5 57:1 63:24 64:9,13 66:5 73:13, 18,25 78:20,24 80:17 89:6,15 93:19, 21 94:15 100:6,13

**arcs** 40:2,22 79:10 88:13,14 89:4

**area** 16:13 17:12 18:5,9,20,23 19:14 37:5 38:16,18,19 39:18,19 41:8 49:21 50:9 51:11 52:5,17 53:9 54:3,5,14,21 57:7,17,22,25 58:7,11,15,20 59:3,4, 25 60:1,11 62:1,4,5,11 63:1,6,12,25 64:1,10,14,18,19,20 65:9,13,25 67:1 69:1 71:8,22,23 72:2,4,8,10,11,17,18 79:8 81:10 85:6,7,9 99:10

**areas** 49:16

**arrive** 32:12 68:17 84:25

**arrived** 61:6

**arrows** 49:18

**Arson** 17:20 22:18

**article** 22:3 87:21 99:23

**articles** 22:1 87:25

**artifact** 38:2,6,25 64:6

**artifacts** 10:4 11:16 15:20 18:5 19:14 37:14,16,22 40:15 41:11 52:17

**assembly** 29:15

**assist** 21:15 22:20

**Association** 17:20 91:21 97:8

**assume** 24:25

**assuming** 30:15 32:18 37:8 38:21 81:21

**assumption** 53:22

**attach** 100:1

**attached** 94:4

**attachment** 51:15,16,22

**attachments** 40:10

**attack** 38:5 88:22,23 90:13

**attendance** 7:19

**attended** 7:6

**attention** 17:7 62:23

**attic** 16:22,25 49:23 54:9 57:16 62:6 65:18 71:4

**attorneys** 30:22

**avoid** 68:22

**award** 20:11,17

**aware** 12:14,16,18,22 13:16 15:18 58:6 59:8 73:8,17 75:4,5,10,15,25 76:8 77:3 82:10 84:1 88:13 97:5 99:16

---

**B**

**B-U-C** 4:23

**back** 26:18 31:6 43:18,20,22 44:6 56:12 61:24 86:5 100:4

**backing** 93:14

**Ballard** 48:8,9

**barbed** 27:13

**Barnhart** 29:22 30:1

**Barnharts** 29:24 30:8

**barrier** 15:20,25 16:5,8,13,17,21,24 17:1,6 18:9 19:7,13 54:8,25 55:12,14, 17,23 56:7,23 58:24 64:23 65:24 66:9 67:24 68:5,25 71:4,8 72:12,16 85:1 91:19 92:2,12,21,22,25 93:2,3,6,10,

13,20 94:3,10,17

**barriers** 15:14,17,21 94:15

**base** 10:10 12:2,6 13:11 53:2 80:23 81:9,24

**based** 25:3 29:11 30:10 33:2 35:2 37:4 40:19 56:21,22 59:10 60:18 61:3 68:15 73:20 82:2 84:6 94:6 98:9

**basement** 20:20 30:4

**Bates** 46:4

**bathroom** 42:24

**battery** 78:3

**bed** 61:18

**begin** 81:24

**begins** 65:1

**behalf** 4:6 21:2 26:2 27:8,22 29:24 31:17 32:5 36:25 37:11 42:20 102:1

**behave** 101:2

**bend** 96:14

**benefit** 96:13

**bias** 40:5 68:22

**bidet** 27:13

**big** 99:3

**bigger** 82:22 96:17

**bike** 31:19

**Bill** 101:17

**bit** 20:16 40:21 53:23 62:24 92:7

**black** 23:2,7,10,17,20,24 24:2 25:1,8 91:18 96:10 100:25 101:1,3,4,10

**blade** 90:12

**blank** 57:12

**bled** 36:17

**blew** 32:9

**Block** 43:9

**blow-in** 27:24

**blowhole** 30:25

**blows** 91:1,2

**board** 40:13 93:14

**boards** 40:8 91:4

**bond** 34:10 70:12,17,18,19

**bonded** 34:5 98:22

**bonding** 34:9,23,24,25 35:4 71:1 98:17,22 99:7,14,17,25 100:5,12,21 101:1,10

**bono** 21:3 27:1

**bottom** 72:15 77:22 79:6 89:17

**box** 28:20

**boxes** 28:16

**braided** 27:12

**brand** 32:7

**brass** 40:7,9,11

**break** 19:21 26:17 43:13,19 44:8 85:21

**breaking** 96:14

**Breckenridge** 46:16,24 47:4

**Brewer's** 36:10,18

**briefly** 26:21

**bring** 5:7

**brought** 20:1

**BSH** 37:7 38:20 39:24 40:6

**Buc** 4:3,10,16,23 5:21 41:14 44:8,13 45:1 46:4 86:7 101:24

**Buc_153** 46:6

**Buc_162** 46:6

**bucket** 37:6

**building** 50:22 97:15

**burden** 77:1

**Bureau** 4:4 14:14,15 15:1 24:15 25:25 26:4 27:5,8,17 29:6,7 30:14,15, 17 31:3,6 45:17,19 102:1,3,6

**Bureau's** 25:20

**burn** 55:17 61:21 64:24 65:4,11,14, 20 67:16,24

**burned** 63:5

**burning** 57:6 58:13 62:5 65:7 75:3 83:8

**burns** 57:10 85:6

**burst** 31:11

**butane** 24:9 92:18

**butcher** 29:17

---

### C

**cable** 11:17,22 50:14 51:9 53:5 56:23

**cables** 10:22 18:7 50:14 52:20 53:17

**calculations** 73:8

**call** 7:18,20,21 8:1,4 12:10 23:16 59:9 61:4,6

**called** 7:15 11:8 22:17 48:24

**calls** 9:16

**capture** 81:22

**care** 101:1

**careless** 37:5

**Carrie** 4:23

**case** 6:1,13 8:16 10:5 14:9,12,14 18:6 21:5 27:1,5,17,20 28:25 29:6,7, 10,23 30:21 31:7,13 32:4,12,14,17, 21,22 33:9,17,22 34:13,19,24 35:5 36:9,13,24 37:10,11,20 39:22 40:16 41:5 42:19,23 43:4,10 45:4,8 52:19 59:6 63:22 64:5 67:4 70:9 76:25 77:11,14 78:23 80:10 81:25 82:5 86:18 87:9,14 91:7 92:1,4 94:21 95:25 96:2 98:1,7 102:7

**cases** 15:3 17:8,25 33:18 35:3 40:5 73:20 78:14 91:12 97:7 99:15 100:10 101:25

**CAT** 50:14

**Cathcart** 8:11 9:1,5 34:7 40:3 42:1 45:18 56:8 65:16 75:18 76:12 77:16 79:18 85:22 101:18,22

**causation** 85:11

**caused** 25:1 31:12 39:6,25 40:2 41:24 57:2 65:23 66:1 68:21 75:11 76:9,21 79:11 80:13 82:10 83:8 88:14 92:18

**causing** 31:19 88:15 89:14

**Central** 4:2

**certainty** 56:18 93:22 98:25

**certified** 17:19 19:15 98:5

**CFI** 4:10

**chafing** 90:14 98:15

**change** 59:16 63:22 64:1

**changed** 43:15

channel 92:14 93:10,12

chapter 22:3 54:20

char 88:6,10,14 89:4,15

characteristics 16:10 22:19

characterization 64:15

characterize 13:12 14:16 18:1 38:10 64:6 65:3 88:1

characterizing 38:25

charge 21:22 72:21 73:1,3,6 75:7,12, 21 76:2,4,9,21 82:12 83:13 84:11,16 99:8

charred 60:20,21

chemical 10:20,21,25 11:14 41:2

chemically 14:4

chemistries 10:10

chemistry 10:7 12:2 13:11 52:18 53:2 56:21 78:17 80:24 81:10,18,24 82:7

children 67:25

choosing 81:21

Christine 44:10

cigarette 37:6

circle 72:1

circled 72:4

circuit 40:8,13 52:12 88:19 91:3

City 47:21

claim 26:6 27:8 29:9,16 42:22

clarification 11:18 12:8 13:20 48:13

clarify 46:11

Clarke 4:6

cleaning 52:16

clear 13:10

client 14:13

clip 56:6 93:10,21

clips 16:10,20 93:14,24

close 50:18 59:12

closely 38:23

co-assignee 68:7

co-authored 15:21,24

coating 42:15

coax 10:22 11:2,17,22 18:7 50:14 51:8 52:20 53:5,17 56:23

Code 70:8,11,24 97:2,6,17

codes 71:2 97:15

coffee 13:7,22 14:1,5

collected 11:19 28:23 45:22 46:13 47:13 53:4 54:10 68:16 82:8 87:14

collecting 11:25

collection 54:2

Colwell 9:9 14:13,24 35:4

Colwell's 49:25

combination 28:4

combustible 55:12,15,23 57:14 59:22 60:10 65:20 73:15

combustion 28:1,9,22 94:8

comment 97:9

committed 12:21

communicated 9:3

communications 8:8,19

companies 35:16

company 4:4 36:16,19 94:20 102:6

comparison 12:11 38:3

competent 38:22 39:10,21 41:9 80:8

complete 25:4 58:10 68:13

completely 81:23

compliant 70:24

complied 70:7

component 40:11

components 55:2,14

composite 16:19

composition 10:21 11:2 13:11,13

compromise 96:16

compromised 34:20 42:16 66:2

computer 5:11

conceding 50:3

concentrated 42:11

concentration 12:4 80:25

concept 90:7,20 93:21

concerned 13:4

concluded 24:4 102:14

conclusion 84:25 92:8

conclusions 94:14

condition 99:5,12 101:11

conditions 17:3 28:7,19 34:21 39:22 55:24 74:19 79:13 94:9 98:24 100:16 101:2

conducted 11:6

conductive 17:2,4 88:10

conductor 13:5,6 14:3,7 18:7 41:4 59:12 64:12,16 66:1,4,5 81:3,7 83:4 90:4,24 91:2

conductors 10:17,19,21 13:19 19:13 38:10,13,16 39:17 40:8 41:1, 22,24 49:22 50:5,7,12,16 54:21 62:1 71:11 79:7 82:15 84:5 88:1,7 89:12 98:20 99:10

conference 7:18,20 8:1

configured 49:23

confined 101:12

confirm 77:19 78:3

confirmation 68:22

confirmed 21:6 73:21

confirming 18:22

confirms 41:8 77:3 80:13

confused 46:22 75:23

confusion 92:16

congratulation 20:15

conjunction 97:14

connect 69:19

Connecticut 95:9

connection 34:10 40:7,13 41:3 88:21 90:11

connector 38:3

connectors 23:5 38:12

consideration 80:23

consistent 17:16 20:25 29:4 38:4 39:1,5 67:13,14 68:10 70:3 80:7 89:13

consortium 35:15

constant 57:13 58:14,15 60:1,3

consume 60:23 66:5,11

consumed 16:13,24 57:25 60:17 62:25 63:17,21,25 64:20 65:23 66:24 67:6 72:18 78:10 85:4 89:5

consumes 55:1

consumption 57:21 58:11,12 61:13

contact 13:6,18 14:8 53:8,20 81:3,6 82:11,15 83:9,15

contacted 14:10 20:22

contacting 64:11

contained 11:9

contemporaneous 49:9

contemporaneously 49:4

contents 25:24

continue 65:4,20

continued 64:24

continues 60:12 67:16

contributing 33:20 36:7 94:18

conviction 21:3

copper 10:9 12:4 31:10 38:13 40:8 50:16 79:7 80:12,16,17,18,24 81:2,9, 13,16,22,23 82:9,12,17 83:4 84:14,18 87:2 90:4

copy 5:9 8:22

cord 20:21,24 21:10,11,13,17,18

correct 5:5,6 6:3,9 11:13 13:21 14:20 23:22 28:11 32:20 34:4,6,11 39:7,19 42:5 43:5,8 45:12,20 46:17 48:3,7,19 51:4 52:2,11 55:20 56:16 57:4,8 58:3 60:19 61:16 64:2,10 68:11,25 70:12 71:20,23 72:13,14 75:16 77:25 78:21 79:8,12,17 85:2 87:18 102:1

correlation 34:16 51:21

corresponded 7:17

correspondence 6:19 8:8 9:16

corresponds 14:5

corrode 42:15

corrosion 23:10,16 24:4 25:1

corrugated 10:6 17:10 18:20 22:18,

20 38:11

coulomb 72:23 73:3 75:7,12 76:22 82:12

coulomb-sized 99:18

coulombs 72:21 73:6 76:1,17 83:13 99:8

counsel 7:20 24:21 31:17 32:5 36:10 42:8

counted 31:4

Counterstrike 15:4,6

County 24:13

couple 9:14 20:7 92:6 94:13 101:18

coupled 10:7 41:6 50:15

court 4:8 95:9

create 73:2,4 76:4,7 99:3

created 61:19

creates 99:4,11

creating 92:20

credible 40:19

Crimson 42:6

criticized 82:4

CROSS-EXAMINATION 101:22

CSST 10:10,13 11:1,15,18,21 12:1,6, 25 13:3,6 14:2,8,16 15:1,10,12 17:8, 12,24 18:6 19:11 22:8 23:1,5 32:21, 22 33:18,19 34:3,5,25 38:14 43:4 46:20,21 47:1,5,8,13 49:16,23 50:18, 22,25 51:7,12,17,23,25 52:14 53:2,9, 14 54:14 55:2 57:5,18,22 58:7,21,25 59:5 60:1,3,12,17 61:14,25 62:12 66:4,18,21 69:6,23,25 70:10,11,16 71:10,17 72:4 73:2,13,20 74:11,16 75:6 78:16 79:7 80:13,18,24 81:3,7, 24 82:11,15 83:9,15 84:8 85:8 86:16, 22 87:15 91:18 94:25 96:23 97:6 98:5,22

Cudd 42:7,8

Cullen 4:16,20

culmination 41:10

current 15:11 31:3 88:11 97:16

cursor 47:20 54:25 62:12 63:2 71:19, 23 72:6

Curtis 45:13

cut 33:6 36:17

CV 19:22 20:9,10 21:20 44:17

D

damage 12:12 14:16 17:10,12 18:2 24:3 27:8,10 29:8 31:12,13 35:12 37:15,21 38:2,6,10,11,25 39:1,6 40:14,23 41:1,4 42:21 52:4,7 54:20 57:17,25 63:8 64:6,16 65:8,9 85:10 88:1 90:25 91:3,5,19

data 7:6 9:25 11:9,10,11,20 13:16,17 19:11,16 28:23 39:13,14 40:19 41:7 46:13 48:1 56:4,20 64:7 66:14,16 67:2,5,9 68:16 75:8,13 77:11 81:18 82:1,19 84:23 85:12 89:2 91:20,22 94:7 98:14

database 13:2 87:11

date 8:1 26:19 47:24 70:13 75:9

dated 45:11

David 26:25

Davis 31:15,17

day 28:24 30:5 49:8,9 102:10

days 20:7

deal 19:21

dealing 90:8

decades 98:10,12

decedent 26:9

December 14:10

decent 84:6

decided 11:24

decision 95:4 100:4

decompose 88:9

Dedivanaj 27:7

defect 32:1,16

defective 42:15

defendant 36:11

defense 35:18

defer 9:1 34:8 35:4 49:25 68:14 70:22,25 90:10,22 98:17 99:9,19,23

defined 18:20

definite 35:13 76:14

deflect 59:24

degrade 89:15

degree 21:4

demonstration 55:18 56:10 61:19

denied 26:6

department 46:16,24 47:4,7 61:1,9
64:17 65:13

depend 80:21

dependent 83:21

depends 57:11 80:20

depicted 53:10

deposed 9:14 24:20,22 26:18,24

deposit 78:9

deposition 4:3,24 5:9,13,20,22,23,
24 9:9 24:22 26:16 29:21 41:15,17
43:9 44:14,19 48:6,14 59:2 67:10,17
69:13 71:15 102:14

depositions 10:1

describes 93:2

describing 21:15

description 69:2

design 32:1,16 33:16,21 35:13 67:24
97:13

detail 47:2 61:20 82:24

detailed 10:7 47:8 52:18

detectives 20:18

determination 18:11,12,24 22:21
68:21 69:16

determine 7:25 13:10 33:19 40:18
41:5,7 90:1 97:10

determined 23:18 25:8

determining 12:2

developing 88:15

device 68:2

devices 90:25 91:6,17

diagram 54:13 56:24 60:13

died 26:11 36:18

Diel 4:5,18 6:6 7:3,4 10:1 16:9,14,22,
25 34:3,5,11 38:7 40:22 41:23 47:12
48:6 49:24 53:25 58:9 69:14 70:16,23
71:13,21 75:22 76:2 92:23,24 93:2,7,

16,18,19 94:3 96:20 98:6,8

Diels 38:14

difference 21:9 40:6 100:7,8

differences 21:16

differentiate 37:24

dimension 60:2

Dinoto 29:6

direct 4:14 51:14,21 70:17,19 98:17
99:25

direction 11:8

disagree 8:9 19:9 51:6 55:2,4 56:13,
14 64:15 70:15 96:7,12,23 97:13,19
100:5,11,21

disassembled 42:25

discarded 37:6

discharge 42:16 94:11

disclosed 93:4

disclosure 19:25

disconnect 69:19

discuss 19:7 77:23 79:20 84:9

discussed 29:18 83:6

discussion 46:16,20 69:4 85:1,4,5

dishwasher 37:12,14

dispersive 11:1

dispute 29:25 32:6 37:2 96:18

disputed 96:8

disregarding 81:23

distinct 40:6

distinguish 88:13

distributed 36:5

distribution 30:25 96:25

District 95:9

DJG 30:14 31:6

document 44:13 86:9 96:3 97:4

documentation 54:3

documents 5:7 7:11 20:2 44:24

dope 101:4

dot 11:8 82:6,8

downstream 54:11

draw 51:20,24

drip 30:3

driver's 4:11

driving 36:14

drop 64:24

Dropbox 5:11,25 6:4,8,20 7:5 11:12

dropdown 65:23 66:4 67:14

dropped 32:9

ductwork 78:17,23

duly 4:11

dump 31:19

duration 65:10 98:19

**E**

Eagar 75:5 99:24

Eagar's 74:15

earlier 45:25 62:24 71:12 90:16 92:8,
16

earthquake 96:15,16,19

edition 22:4 97:16

EDS 11:1,3,5,6,16,21 12:8 13:12,15,
18,21 14:4 52:18 53:4 77:23 81:20
82:4,10

effect 91:18

effective 100:6

effects 85:14

efficacy 99:25

electrical 10:17,19 13:5,6,19 15:25
19:13 30:25 33:1 34:14 35:1 37:13,
15,21,25 38:2,10,23,25 39:9,17,25
40:12,15 41:1,3,4,22 49:21 50:5 52:1,
4,10 55:1,2 64:6,7 88:19 92:14,19,20
98:19

electrode 13:5 34:6 52:14,20 53:5
56:17,21 80:18

electrodes 78:9

electronic 90:25 91:5,17

electronically 6:23

elevated 52:25 53:1

elimination 94:6

Elizabeth 4:3,10,23

email 6:23

emails 6:12,14,25

employment 5:4

end 42:16 83:25

energize 51:17

energized 13:19 14:3,7 51:7,12 52:2,3,10 54:21 64:11 81:3,7 88:7

energy 11:1 84:18

engage 34:19

engaged 33:11,12

engineer 14:15 20:23 21:15 38:23 39:9 64:7

engineer's 40:1

engineering 80:10 94:7

Enid 48:3

ensuing 79:2 81:4

enters 51:18

entire 81:21 82:7 92:10 96:3 97:4 98:19

entirety 45:3 95:19

environment 41:11 42:12

equipment 30:18,23 91:2

erupted 31:19

escapes 74:20

escaping 73:12,14,23 74:11,16 76:19

espresso 13:8,22 14:1,5

essentially 6:5 17:11,22 20:23 21:8 23:3 24:8 26:4 27:23 28:7 30:23 32:2 33:19 35:23 36:1,6,17 52:15 53:12 54:3,13,19 57:21 58:22 66:17 68:15 76:5 82:7 88:7,11 93:20

establish 29:1 54:21 76:5 77:1 79:15 88:2

establishes 75:11 77:9

eutectic 38:5 41:2

evaluate 99:25

event 38:5 39:5,9 51:1 52:14,22,23 56:2,3,5 57:1 73:13,18,25 74:7 78:9, 11,21,25 80:13 83:22 84:7 93:4 96:15,20 100:6,13

events 16:6 35:1 38:8 39:21,25 55:3, 9

evidence 17:23 20:23 26:7 29:12 37:24 38:8,16 39:16 40:23 41:22 51:14 52:9 54:2,6,10 63:24 65:19 76:14 81:4 85:13 92:24 93:23

exact 51:20

exam 5:15,18 6:18,22 7:19 8:2 9:25 11:5,9,15,19,23 13:13 45:22 46:1,14 48:12,18,21 49:4,8

examination 4:14 11:16 18:4,10 19:16 23:4 25:7 26:7 37:13 41:10 46:12 56:19 68:16 92:24

examine 14:16 17:9 18:1 33:19 41:3

examined 10:19 15:19 32:11

exceeds 73:25 76:15

Excellence 20:11

excess 81:9

executed 12:19

exhibit 5:21,23 19:22,23,24 20:3,4,8 26:17 43:14,21 44:17,18,20,21,22 46:3,6,9 62:8,11 86:9,12 87:21,24 92:1,4 95:4,8

exhibits 19:19 43:22 44:9,24 95:23

exist 98:18

existed 94:3

existing 29:4 39:23 69:19 81:7 82:16 83:16

expect 58:10 81:9

expensive 96:10

experience 13:17 15:10 17:21 73:20 90:12 91:5

expert 35:14 39:8

explain 21:9 65:6

exploded 30:7

Exploration 42:6

explosion 23:13,15,18,19 24:7 25:9 30:1 35:6,10 80:4,5 99:5 101:7

Exponent 50:20 64:14 65:9 72:8,17 74:6,10 75:20,23 81:20 82:2 88:3,4 89:5 92:9

Exponent's 10:1 50:20 54:24 55:3 63:1,6 79:8 82:18 83:7

exposed 14:7 67:7 88:8

exposure 27:14 40:15

expressway 31:18

extension 20:20,24 21:10,11,13,17, 18

extent 24:14

extinguishing 65:18

extremely 90:9

F

face 32:10

facilitate 74:21

facilitated 75:2

facility 12:20

fact 82:6

factor 94:18

factors 18:11,24 19:10 33:20 36:7

fail 25:1 33:13 98:20

failed 31:11 43:1 98:13

failure 29:20 31:22,24 32:12,15 33:3 34:19 40:10,17 42:9 98:15

fair 33:9 62:19

fairly 93:25

familiar 8:15 18:8 38:9 96:1,2

familiarity 41:6

family 21:23

Farm 14:14 15:1 24:15 25:20,24 26:4 27:5,8,17,20,22 29:6,7 30:14,15,17 31:3,6 37:7,8,11 45:16,19 94:20,23, 25 95:24 102:1,3,6

fast 58:9

faster 96:9

fatalities 35:11

fatality 20:19

fault 33:1

faux 28:14

fed 69:23

**feel** 43:18

**feet** 60:7

**fell** 30:5

**fiberboard** 37:5

**fiberglass** 55:15

**field** 7:7 10:22 94:6

**fight** 71:13

**figure** 72:3

**file** 5:11,12,25 6:1,5,8,20,24 7:1,5
11:10,11,12 45:23 46:14

**files** 15:5,11,12

**fill** 29:14

**filled** 28:20

**find** 47:1 90:5

**fine** 63:22 96:7

**finish** 85:19,22

**fire** 4:4 5:1 8:14 10:4 12:12 14:7,17
15:17,20 16:25 17:7,14,18,19,21,22
18:10,13 19:1,15 21:5 22:4,20,24,25
23:21 24:7 25:4 27:24 28:1,9,24 31:1,
19 32:25 33:1,8 34:17 37:3,12,15,17,
22,25 38:1,5,10,12,22,24 39:2,6,14,
23,25 40:2,16,20,23 41:1,12 42:4
46:16,20,24 47:1,4,6,12,25 50:22
51:1,11 52:8,10 53:23,25 54:1,25
56:6 57:2,6,7,8,10,13 58:13,17 59:21
60:1,3,8,9,11,12 61:1,2,9,14 64:4,17,
18 65:1,2,5,7,8,13,18,21 66:4,14
67:8,13,14,16,23 68:5,20,21,25
71:13,21,22 73:12 76:15 79:2,11,16
80:6 81:4,7 82:16 83:8,16,19 84:24
85:7 88:1,9,15,22,24 89:5,14,19,20
90:13 91:4,11,21 92:20 97:8 99:3,5

**fireplaces** 67:25

**fires** 15:14,16 22:19 85:6 92:13,17

**fitting** 27:13 33:7 36:2

**fittings** 40:9 98:11

**flame** 54:22 56:11 64:11,22 65:25
93:1

**flaming** 28:1,8,21

**Flashshield** 15:8,9,10,12 32:23
33:4,7,16

**flex** 4:5,17 15:6 43:4 96:13

**Flex's** 15:4

**flexible** 96:19

**flood** 96:15,19

**floor** 42:16,24

**flow** 29:15 58:15

**flowing** 71:25

**foam** 27:24 28:2,3,8,12,15,21,22,24
29:3 94:9

**foams** 28:6

**focus** 65:17

**foil** 16:18,21 17:1,3 63:8 93:13

**folder** 7:14

**folks** 6:12 85:20

**footage** 47:17

**footnote** 78:1,7,15

**forced** 78:15

**forever** 101:6

**form** 6:23 8:11 9:5 34:7 40:3 42:1
45:18 56:8 65:16 75:18 76:12 77:16
79:18 93:18

**forms** 16:5 17:4 23:4 91:18 94:17

**fortunately** 30:8

**found** 20:20,25 27:13 38:25 57:18
66:21 81:16 96:24

**fragment** 36:15

**frame** 28:9 63:18

**frames** 61:18

**framing** 57:22 58:18 59:14,18,25
60:14 63:9 94:4

**fraudulent** 27:7,10 29:8 42:21

**freezing** 27:14

**frequency** 89:25

**front** 46:10 66:12 67:25

**froze** 31:11

**fruition** 68:8

**fuel** 19:5 32:1,2 35:23 57:11,13 64:25
65:4 70:8,11,24 73:12 85:13 97:1,6,
17

**fueled** 57:8,10 60:12

**fueling** 60:9

**full** 4:21

**fully** 60:17,23 62:25 63:5,17,20,25
64:19 65:23 66:5,11,24 67:5 85:4

**fully-consumed** 58:6 59:8,17

**furnace** 30:3,6,12

**fuse** 91:1,3

**fusion** 75:2

## G

**gable** 51:17

**galvanized** 78:16,23

**gap** 33:6

**gas** 22:25 23:1,3,4,5,11,16,24 24:2,4
26:9 30:5,7,12 35:13 36:5 38:11
51:11 57:6,8 58:15 59:23,24 60:8,12
69:19 70:8,11,24 73:12,14,23 74:11,
16,20 75:2 76:16,19 79:25 80:4 96:25
97:1,2,6,17,21 99:4 101:12

**gas-fed** 64:18

**gas-fired** 30:11 69:18

**gasoline** 31:23

**gathered** 66:14 84:23

**gave** 22:23

**Geer** 15:22 16:11

**general** 16:15 18:23 23:16 47:17
49:5,6,25 50:15 54:13 57:19,20 60:15
72:3 73:24 74:2,4 97:18 98:2

**generally** 49:23 57:9 71:10

**generated** 39:14 92:17

**generator** 69:10

**ginormous** 31:8,12

**give** 60:1 78:3

**glass** 67:25

**Good** 4:16,20,21

**great** 102:10

**greater** 64:25 65:3,8,9

**greatest** 57:24

**ground** 51:19,25 90:12 94:11

**grounding** 34:6,9,23 35:4 71:1

**Group** 74:14 82:14,21

**groupings** 50:11

**guess** 21:6 23:20 35:15 39:6 48:22 50:11 57:1 59:9 65:23 78:12 95:15

**guide** 97:14 100:12

**Guilmartin** 4:14,16 8:13 9:8 34:12 40:21 42:3 43:25 44:8,16 45:1,21 46:3,9 56:12 62:10 65:22 75:20 76:20 77:18 79:20 85:16,23 86:7,15 87:24 92:6 95:7 101:19

---

**H**

**half** 61:22 76:22 85:18

**half-inch** 12:11

**Handbook** 22:4

**handful** 6:14 83:3

**handwritten** 5:10 46:11

**hanging** 21:19

**happen** 29:1,3 76:24

**happened** 98:23

**happy** 85:20

**hard** 26:14

**Harley-davidson** 31:15,18,22,25

**hate** 92:10

**Hayes** 37:11

**hazard** 99:3

**hazardous** 99:4,12

**HD** 48:25

**head** 25:12 26:14

**heat** 28:19 88:9,23 89:14 90:13

**heater** 30:12 69:9,12,18,20,24 70:3,7

**heaters** 69:15

**heavily** 60:21

**held** 16:21

**Herberger** 14:21

**Hergenrether** 9:10 14:23,24

**hesitate** 96:3

**high** 76:19

**high-level** 47:6

**high-resistance** 41:3

**high-surface** 37:5

**high-voltage** 12:19 90:9,19,20,23 93:4

**higher** 72:23,24 73:3 77:6

**highlight** 69:8

**highlighted** 80:9

**highlighting** 84:21 92:11

**historical** 97:23

**historically** 88:25 98:1

**hit** 26:14

**holding** 42:14

**hole** 12:7 49:12,15 50:18 53:16 57:18,22 58:7,21 59:4 61:25 72:20,22 73:7,18 75:21 76:2,9 78:20 80:12,13 82:23 83:1,7,20 99:2,4,11,14,18 100:23 101:11

**holes** 82:10,23,25

**home** 16:9,14 23:11,12 24:10 28:1, 10,24 30:7,8 31:8,12 32:8 34:3,5,11 37:7 38:7,20 39:24 40:6,22 41:23 49:24 61:9 69:6 70:16,23 75:22 76:2 90:24 92:23,24 93:7,16,18,19 94:3 96:17 98:8,19 100:1 101:13

**home's** 34:6

**homeowner** 26:3,9

**homicide** 20:19 21:5

**honestly** 71:24

**hope** 19:20

**hose** 36:2 71:14

**hour** 61:10,22 85:18

**hours** 22:17,24 28:22 101:16

**house** 47:15 52:3 98:12,20

**household** 40:12 52:1

**Houston** 35:10

**hung** 20:25 21:7,14

**husband** 21:4

**hydrochloric** 42:11

**hypotheses** 19:5

**hypothesis** 90:3

---

**I**

**ICP** 9:25 10:3,4,9,12,15,16 11:4,15,

19,24,25 12:5,8,9,10,24 13:3,8,10 52:18 53:2 86:12,15 87:8

**identical** 86:20,21

**identification** 44:25 46:7 62:8 86:13 87:22 92:4 95:5

**identified** 4:11 18:21 31:21 53:14 54:19 68:7

**identify** 68:15

**ignite** 36:1 66:10 73:14,22 76:19 93:9

**ignited** 19:5 28:3 35:23 65:4 69:2 73:12 80:5

**ignition** 16:1 17:13 24:8 28:13 29:1 30:9,11 31:23 35:25 37:5 38:22 39:10,21 40:19 41:9 51:10 55:5,10, 17,24 56:1,11 73:17,25 74:7,9,10,15, 18,19,21,24 75:6,12,22 76:1,10,15,22 77:2,7,20 79:11,21 80:1,8 93:1 94:6, 9,16

**illegal** 24:9

**impact** 90:23

**impacted** 88:20

**impacts** 91:16

**impedance** 99:10

**implement** 68:1

**import** 49:1

**improper** 28:17 32:22,24 34:16

**improperly** 30:2 33:24 34:13 98:10

**inadvertently** 32:9

**inception** 65:1,7

**inch** 94:1

**incident** 30:5 36:18

**include** 7:5 18:5,21 23:5 25:6 33:10 46:12 67:5 74:12

**included** 7:5,14 23:1,2 92:25

**includes** 41:2

**including** 11:17 18:24 19:11 25:7 41:12

**incomplete** 25:10

**increase** 100:15

**independent** 8:6 52:9 70:11

**independently** 51:5 96:24

**indication** 53:4

**indirect** 70:17

**individual** 70:7

**induced** 80:14

**inductively** 10:7

**Industrial** 5:2

**industry** 17:24

**inertia** 85:14

**influence** 40:5

**information** 28:5 39:2 47:10,11 65:12,13 66:8,12 67:1 72:21 99:7

**initial** 25:16 50:25

**initially** 26:6

**initiate** 100:8

**injured** 26:12

**injuries** 31:21 32:11,13 67:25

**inlet** 34:11

**inside** 24:10 35:13,25

**inspecting** 14:19

**inspection** 58:2,4

**install** 70:2 98:5

**installation** 16:10 28:17 32:23,24 34:3,15,16,18,22 94:18 97:14,16,22 98:14

**installation-related** 98:16

**installations** 16:5

**installed** 16:9 17:12 18:6 27:25 30:3 33:4,24 34:13 69:6 71:2 96:9 97:20 98:10

**installer** 70:1 98:4,8

**installers** 31:10

**installing** 69:17

**instance** 34:23 51:13,20 81:19 99:17

**instances** 78:25

**Institute** 12:16

**instrumented** 28:18

**insulate** 31:11

**insulation** 16:19 27:20,25 61:18 63:11,15 66:1 75:2

**insults** 40:15

**insurance** 4:4 24:15 25:22,23,25 27:9 29:22 32:17,18 34:12 35:16 42:18,20 94:19 102:6

**insured** 24:15 25:16,20,21 27:23

**intact** 38:3 59:11 63:8

**integrity** 6:13,17 7:1,9,12,15 9:19,25 11:7,9,22 12:15,17,18 13:1,23 14:3,5 15:19,22 17:14 34:20 55:19 61:13 74:13,14,22 75:5,25 77:14,17,18

**Integrity's** 7:1,6,7 56:25 57:6 58:5 69:15 92:11

**interacted** 51:25

**internally** 88:12

**International** 17:20

**interpret** 17:11

**intimate** 14:8 53:8 81:3,7 82:15 83:15

**inventory** 66:17

**investigate** 35:16

**investigating** 20:19

**investigation** 17:21 18:11 24:12,18 25:5 26:5,7 27:24 29:11 47:8 54:1 66:14

**investigations** 17:20 37:4

**investigator** 17:14,19 18:13 19:2,15 25:4,11

**investigators** 17:22 22:20,25

**invoice** 7:25

**involve** 15:5,12 27:21 29:25 32:6 35:9 37:2 59:22

**involved** 14:12 15:17 20:19 23:7 24:14,17 30:23 50:25 52:21 74:3 94:10

**involvement** 64:23

**involving** 15:1,3,8,13 21:6 23:23 24:2 39:2 46:20 64:3 95:24

**ipad** 48:24 49:2

**iron** 23:2,7,10,20,24 24:2 25:1 90:4 91:18 96:10 100:25 101:1,3,4,10

**ISFI** 16:11

**issue** 15:24 16:2 24:23 27:11 41:14 98:16

**issued** 45:7,14 95:13

**issues** 20:7 35:4,14

**itching** 85:20

**items** 7:12

---

**J**

**jacket** 33:6,7,11 59:12 73:2,15 78:9, 12,20 79:4

**James** 26:25

**January** 8:2 20:12 35:6

**Jester** 34:19

**Johnie** 73:5

**joint** 58:2,4

**joist** 58:6 59:8,17 60:24 63:21,25 64:20 65:23 66:6,10,11,25 67:6 85:5 89:17,18,23

**joists** 60:17

**Joshua** 4:5

**judgment** 95:9

**jugular** 36:17

**June** 35:6

**jury** 21:9,15 65:6

---

**K**

**K-R-Y-K-U-N** 25:17

**Kelly** 9:9,14 34:8 35:4 70:22,25 90:10,22 98:17 99:9,19

**Kelly's** 50:24

**khaki-colored** 32:8

**kills** 101:7

**kind** 20:2 44:12 49:8,22 52:7 63:14 68:22 69:8 72:7 75:23 79:2 84:3 88:2 89:16 92:16 93:15 96:3

**knots** 20:21 21:13

**knowledge** 16:16 70:6,16 102:7

**Krykun** 25:17

---

**L**

**L-I-V-O-N-I-A** 5:3

**lab** 5:15,18 6:18,22 7:6,19 8:2 9:25 11:5,9,15,19,23 13:13 28:12 45:21 46:1,14 48:12,18,21 49:4,8 55:16 56:10 77:23 92:17

**Laboratories** 10:8

**laboratory** 5:2 10:20 12:20 25:6 26:7 28:6 37:4 46:12,13 56:19 61:15, 19 68:16 74:15 78:8,16 92:24 93:3 94:7

**laboratory-created** 14:2,6

**lack** 30:24 78:12

**ladder** 62:18 72:7

**Lake** 36:24

**laptop** 5:11

**large** 35:10 42:11 93:25

**Larry** 25:16

**late** 14:10 74:15

**latest** 22:4

**Latorski** 42:18

**lawsuit** 24:11 25:14

**layer** 93:13

**layers** 63:14,15

**League** 36:23 37:1

**leak** 25:8 53:14 66:21 96:17

**leak-free** 101:6

**leaking** 96:14

**leaks** 23:24 24:2

**leave** 17:14 44:22 85:17

**left** 5:11 33:6 71:17 85:18 90:1

**leg** 26:14 30:3

**legs** 31:19

**length** 69:25

**lengths** 47:13

**level** 47:2

**levels** 52:25

**Lexitas** 4:6 44:11

**Liberty** 32:17,18 34:12

**license** 4:11

**light** 30:11 62:16

**lighter** 56:4 92:18

**lightning** 12:16,20 16:6 32:25 34:21 51:8,15,18,21,24 52:2,11,23 61:7,8 80:11,14 90:9,19,21,23,25 91:10,14, 15,21 94:10 98:13,21 99:9,20,22,25 100:14

**lightning-induced** 33:3 91:5

**likelihood** 84:12 100:13,16

**Limited** 25:13

**lines** 23:2 31:10

**link** 6:4,8

**list** 26:16

**listed** 21:20 66:19 75:4

**listing** 47:9

**literature** 10:2 28:4 29:5 35:2 94:7

**litigation** 24:17 35:7

**Livonia** 5:3

**LLC** 5:2

**load** 57:11 65:4 85:13

**local** 97:15

**localized** 37:21 38:3,6,8,15 39:5 40:11,16 41:1,7 64:6,9,13 91:19

**locally** 94:24

**located** 19:11 57:23 59:5

**location** 12:12 38:4 52:17 53:18,21 59:1,21 60:4,14,15 65:21 67:12 71:10 72:3 73:16 81:22 88:19 89:10,11 90:17

**locations** 71:4,7

**lone** 59:9 60:9 89:16

**lonely** 89:16

**long** 41:18 66:8,10 91:10,15,16

**looked** 11:2 38:12 78:17 79:3

**losing** 41:17

**loss** 4:18 6:6 7:3,4,17 10:4 29:12 35:16 60:21,23

**losses** 8:14

**lot** 12:18,23 34:18 57:21 63:7 75:13 81:4

**low** 54:24 78:3 83:9,10

**lower** 83:25 84:2,11,15

**Lubbock** 97:10

**lumber** 58:19

**lunch** 85:20

**M**

**made** 23:10 71:2 95:24

**magnetic** 67:19

**main** 23:11,12 24:4

**mains** 23:3

**maintaining** 87:11

**majority** 11:21

**make** 22:13 40:6 51:16 69:16 84:12

**making** 22:21 68:20 78:13 96:10

**manifest** 90:11

**manipulated** 27:15

**manually** 42:25

**manufacturer** 68:1

**manufacturers** 12:1 93:5

**mapping** 11:9 38:19 41:6 54:16,17, 19,23 55:3,5,7 56:13 82:6 84:22

**maps** 82:8

**March** 45:11 95:13

**marijuana** 24:9 26:12

**mark** 5:20 9:10,14 14:21 19:21 26:16 44:17,18,19 46:3

**marked** 5:22,23 19:22,23,24 20:8 43:14,21 44:20,22,24 46:6 62:8,11 86:8,12 87:21 92:1,4 95:4,7

**Marshal's** 22:24

**Marshals** 97:8

**mass** 60:21,23

**material** 17:10 64:24 69:2 74:3 78:12 79:1 84:2,12 93:2

**materials** 5:2,12 7:2,4 20:22 21:8,15 22:25 23:3 36:7 41:9 45:22 57:14 59:22 60:10 65:20 94:10

**matter** 4:3 10:2 14:19,20 24:20,23 25:20 26:19 27:5,6,11,21 29:16,18,22 30:9,14,16,18 31:15,16 33:5 35:6,9, 14,18,21 36:8,23 37:7 40:7 42:6,7,13, 18 43:3,9 61:17 64:3 74:23 76:16

96:20 98:21

**matters** 14:25 15:8,13,16 23:23 24:2 31:3 94:23 95:1

**Maxwell** 32:3

**meaning** 84:5

**means** 43:2

**meant** 98:23

**measurements** 66:20

**mechanical** 30:14 31:6 41:2

**mechanism** 93:9

**Meemic** 42:18,20

**melt** 13:13 38:4 73:21 74:3 76:18 79:3 80:12 81:2,10,21 84:16,18

**melt-through** 30:25

**melted** 60:13

**melting** 38:6 40:11,16 41:2,7 73:21 76:14 77:6 84:14,15

**member** 63:17

**members** 60:24 61:13 62:21 63:5 85:10

**memory** 12:21

**men** 26:11

**mentioned** 5:21 21:22

**mentioning** 47:7

**mesh** 33:10,12,13 34:20

**messed** 94:13

**met** 4:17 94:9

**metal** 10:10 12:2,6 13:11 53:2 80:24 81:10,24 100:8

**metallurgical** 43:1

**metallurgist** 14:16 17:9 18:1 37:13

**metallurgy** 18:19 35:15

**metals** 78:8

**method** 84:24 87:25 96:25

**methodology** 40:17 41:5 68:9,10

**Michael** 4:5 11:6 48:6

**Michigan** 5:3 20:12,18,22 21:2,23 22:18 25:19 27:5 31:9 36:23,25 102:3

**microscopy** 25:7

**mid-run** 90:7

**Midland** 42:10

**midstream** 88:17,18,21,23 89:7,13 90:13 91:8

**migrate** 23:12

**millimeters** 73:19

**million** 35:11

**mind** 15:2 23:14,25 24:5 43:11 59:13 84:10

**minimize** 18:25

**minimum** 73:1 76:4 94:8

**minor** 10:9

**minute** 49:10

**minutes** 55:11 61:7,11,12 64:18 66:3 85:16,24

**missed** 30:17

**missing** 93:21

**mitigate** 35:1 98:23

**mitigated** 36:5 99:17

**mix** 92:9

**mixing** 74:21 80:1

**mixture** 35:24 36:1 74:8

**Model** 97:1,6

**molten** 77:5

**morning** 4:16,20,21

**Morris** 81:16

**Morris'** 81:25

**motion** 95:8

**motorcycle** 31:22,25

**moved** 53:23

**multiple** 35:25 39:16 51:19,25 54:14 62:1 86:25 88:5

**Municipal** 36:23 37:1

**murder** 21:4,6 27:1,2

**Mutual** 4:4 102:6

**N**

**N921** 18:15 19:3

**nail** 88:20,24 89:10

**National** 70:8,11,24 91:21 97:1,6,8, 17

**natural** 30:7 73:23 91:11

**nature** 18:8 34:9 36:12 68:18

**nearby** 48:2 57:14

**necessarily** 91:4

**neck** 20:21,25

**NFPA** 17:16 54:19 68:10,13,19 70:3 79:14

**Nikola** 27:7 29:17

**non-arc** 93:1

**noncombustible** 63:14,15 68:5

**notation** 48:8 49:12 52:24

**notations** 48:5 62:20

**notch** 84:5,6

**note** 48:25 54:8 69:1 72:3,20

**noted** 4:7 67:12 82:16

**notes** 5:10,14,17,18 6:18 7:7,15 9:24,25 46:1,6,10,11,14 48:11,12,14, 18,20,22,23 49:3,8 60:13 61:3 62:17 69:13

**notice** 5:10,13,20,22,23,24 44:14 59:11

**noting** 50:2 79:6

**NTS** 12:15 13:1,7,22

**number** 14:3 18:7 40:25 46:4 52:17 76:17 82:25 99:24 101:25

**nut** 29:13 33:11,12 34:20

**O**

**Oakland** 24:13

**object** 9:5 34:7 40:3 42:1 45:18 56:8 65:16 75:18 76:12 77:16 79:18 94:1

**Objection** 8:11

**obligation** 70:2

**observation** 70:21 82:17

**observations** 62:5 70:25 93:6 94:6

**observed** 40:22 82:23

**obstruction** 74:20

**obvious** 25:22 93:5

**occupant** 25:24

**occur** 27:14 40:14 66:2 70:22 78:16 83:1,16 88:18,19,23 89:6,19

**occurred** 7:24 25:8 27:24 28:9 30:8 33:4,7 40:10 54:24 55:11 57:1 66:20 78:21 83:22 92:13

**occurrence** 80:6

**occurring** 80:23 83:18 88:16 89:13

**occurs** 17:24 74:7 83:23 84:7

**offer** 29:10 33:15 34:2 37:10,19 42:13,23 77:15

**offered** 23:20 26:22 33:23

**offering** 17:16 45:4

**office** 5:1,6 20:7 22:24 24:13

**Ohio** 25:13

**Oklahoma** 4:3 14:14,15 45:20 47:21 102:6

**Omega** 4:5,17 15:4,5 43:4

**on-site** 53:12

**one-answer** 100:2

**ongoing** 31:9

**open** 5:11 15:5 19:18 31:3 41:19 56:11 93:1

**opening** 13:13 14:2,7 18:19,23 19:10,14 51:23 52:16 53:13,19 54:4 58:9,23 73:2,4 75:1 76:4,5,7 78:18 79:3 81:21 82:7 85:8 91:24

**openings** 23:17 25:7 33:19 49:16 83:3

**Operating** 42:6

**opine** 17:11 18:1 20:24 34:22 37:14

**opined** 34:13 39:9

**opinion** 17:16 19:4 23:20 28:2,3 31:24 32:14 33:15,23 38:21 39:4,24 40:1 42:4 50:21,24 51:3,5,7 52:13 54:24 57:1,17,24 60:8 64:1,25 65:22 70:1 73:11 77:15 89:3 99:7,11 100:18

**opinions** 8:20 9:4 19:17 29:10 33:17,21 34:1,2 35:20,23 36:4 37:10, 19 42:13,23 45:3 59:16 63:23 68:14, 17 73:11

**opposed** 16:20 37:23 38:5 40:12 43:1 49:9 56:23 74:4 82:25

**opposing** 13:5 24:21,25 52:13 53:5

**opposite** 40:1 53:17

**orange** 20:20

**orbital** 32:11

**order** 19:3 28:12 34:25 60:6 68:1 69:18 72:23 73:3,10 74:9 77:12 79:16 80:1 95:10

**orientation** 57:11 85:14

**oriented** 53:19

**origin** 16:13 17:16 18:11,12,15,21, 23,24 19:3 26:5 36:6 38:16,18,19 39:18,19 41:8 49:22 52:5 54:21 60:11 62:2,4,11 63:1,6 64:14,19,21 65:9,25 67:12 68:15,18 69:1 71:9 72:2,4,8,10, 11,17,18 79:8

**originated** 15:14 33:8 47:1

**originating** 46:21

**outlet** 34:10

**owner** 26:3

**Owners** 29:22

**oxidizers** 22:5

**oxygen** 35:24 74:9 80:1,8

**Ozment** 7:16 8:3,7,13,17,19,25 9:2, 21 19:2 64:20

**Ozment's** 8:22 45:13 56:25

---

**P**

**p.m.** 61:4 102:11,14

**packed** 63:12

**pain** 43:18

**Palmer** 25:19

**panel** 31:1

**panels** 93:12

**paper** 5:9 15:24 16:2,11 82:24 88:2 93:2,5 94:15

**paragraph** 66:13 69:7 71:3 72:20 77:22 80:10 84:21 85:3 92:11 93:25

**parcel** 68:18

**part** 5:12 6:24 7:10 18:9 19:9 24:15 25:25 46:14 50:7 54:10 68:18 93:7

**participating** 38:24

**particulate** 94:8

**pass** 88:11

**passenger** 36:14

**passive** 67:24

**past** 102:5

**patent** 68:4,8

**patents** 67:18

**Paterson** 95:4,24 96:1,2 100:4

**paths** 51:19,25

**Patricia** 36:8

**Patterns** 54:20

**pay** 24:22

**PE** 4:10

**peak** 57:2

**pen** 48:25

**people** 26:25 101:7

**percent** 75:21 76:1 80:20 96:9

**perforated** 54:14

**perforation** 12:13 66:21 72:4

**perforations** 74:16

**perform** 10:20 11:7,24 12:24 19:17 26:5 37:13 40:4 68:13 70:9 77:19

**performed** 10:8,16 11:15,22 12:10, 15,23,25 13:18,21,23,24 15:19,24 16:1 19:6 21:24 28:11 31:10 55:18 56:10 61:13 68:9 69:5 75:1 76:20 77:23 82:14 84:4 87:17 98:9,12 99:24 101:8

**performing** 26:6 75:6

**person** 80:22 97:20,25

**personal** 26:13

**personally** 15:19

**Ph.d.** 4:10

**phenomenon** 91:15

**photo** 53:11 62:10 63:1,13 71:17,18 72:1

**photograph** 49:11 62:8,14 63:7,10

**photographs** 6:18 7:7,9,15 9:24 14:21 16:20,24 46:13 47:12 49:1 50:1,12 53:8,12 54:1 58:5,8,12 59:10, 13 60:19 66:20 67:11 69:15

photos 48:20,21,22 49:3 53:16 57:16 71:16

physical 20:23 29:12 31:21 41:11 77:11 93:23

physically 21:16 29:14

picking 82:4

picture 50:9

piece 36:20 86:22 93:15

pilot 30:11

pin 90:12

pinched 88:24

pink 53:13

pipe 23:2,7,10,17,21,24 24:2 25:1,8 91:18 96:10 100:25 101:1,3,4,10

piping 22:25 23:1,4 30:5,13 97:2,21

pitting 23:10

place 5:4

places 64:14,20 72:8

placing 72:2

plaintiff 24:21 25:4 36:25

plaintiff's 35:17,19 77:1

plaintiffs' 73:11

plasma 10:8

plastic 23:2 29:12 88:8,9 89:15

plastic-backed 64:23

plate 69:15

plug 90:11

plug-type 40:9

plugged 78:3

Plumbing 48:8,9

point 19:18 28:8 32:8 48:1 51:15,17, 22 62:23 67:9 78:13

pointed 41:19

pointing 18:15 47:20

points 81:17 82:5

Police 20:12,18,22 21:2,23

policy 25:22,23,25

polystyrene 94:9

poor 21:6

portions 60:24

position 19:1 55:8 56:14 96:6

positive 76:13

possession 14:2

post 23:18 25:9

post-explosion 24:3

potential 17:13,17 19:4 35:25 68:4, 20 79:11 91:11

pounds 21:12

pre 23:18

pre-fire 88:18

pre-litigation 24:18

pre-removal 53:7

preclude 95:8

predicate 56:14

preliminary 25:5,9

premarked 19:19

premises 26:3

preparation 9:8,18

prepare 9:23

prepared 25:5

presence 12:3 18:8 19:12,13 73:21 77:5 78:11 81:1 82:9 99:11

present 10:9 11:7 33:14 79:3,4 81:2 92:23

presentation 15:21 16:4,7 22:12,15 23:7,8,9 101:8

presentations 21:25 22:2,6,8,15,16

presented 16:11 22:17

pretty 23:15 26:14

prevent 67:24 99:18,21 100:22 101:11

prevented 99:8,14

prevention 67:23

previous 40:5 78:7 81:19

previously 15:16

price 43:16

principally 17:9,25

principle 73:24 74:2,5

printed 40:8,13 91:3

prior 19:22 29:16,17 61:12 64:3 67:17

Privilege 43:3

Privileged 43:7

pro 21:2 27:1

problem 43:24 78:7

problems 96:17

proceed 78:6

process 54:1 61:5

processing 17:23 24:9 26:12

produced 7:5 45:23 87:5

product 15:4,7,18 33:16,24 34:21 98:3,18 101:4,5

production 4:11 5:25 6:5 7:11

products 15:6 92:13 96:23

Professional 20:11

Professor 99:24

Program 97:22

projectiled 36:16,21

prone 96:14

propagate 56:6

propagating 52:8

propane 47:9 51:11 57:8,9,10 65:1,7 66:18 73:23 74:1,9 76:16 77:7 79:22 80:1,7

properly 31:11 33:4

properties 20:24 74:2

property 29:22 35:12 66:19

propylene 35:13,24 36:3,5

Protection 22:4 91:21

provided 7:2 9:6,7

proximity 50:18 59:12

publication 93:8

published 13:17 81:1 99:23

pull 44:9 86:8

pulled 62:10

pulling 49:4

Pumping 42:7,8

**punched** 32:9,10

**purchased** 32:7

**purpose** 12:1 76:6

**put** 13:6 44:12 48:21 49:22 59:17 62:20 65:19 71:21 78:20

**putting** 22:22 71:22

---

**Q**

**qualifications** 97:23

**qualified** 18:14 97:20,21,25

**quantifying** 82:25

**question** 13:14 41:16,21 46:22 75:14 76:24 77:13 96:3 98:17 99:13 100:2,20

**questions** 4:18 41:18 43:13 92:7 95:23 101:17

**quicker** 101:15,16

**quickly** 44:11 55:17 57:10 61:1 80:6

---

**R**

**R009** 14:3,5

**radar** 22:22

**radiant** 15:14,17,20,21,25 16:5,8,12, 16,24 17:1,6 18:9 19:7,12 54:8,25 55:12,14,17,23 56:6,23 64:23 65:24 66:9 68:25 71:4,8 72:12,16 85:1 91:19 92:2,12,21,22,25 93:2,3,6,10, 13,20 94:3,10,15,17

**ran** 12:17 55:16 58:25

**Randy** 31:15

**range** 49:16

**rate** 19:23 43:14 44:20 55:21

**rates** 43:15,17

**reach** 58:18

**reached** 14:12 51:5

**read** 67:21 91:23 94:5,12 95:16,17,18 100:18 102:9

**readily** 55:23

**reading** 96:2 97:3

**ready** 43:22

**reason** 8:9 70:15 88:17,22

**reasons** 93:5

**rebuttal** 45:8

**recall** 7:24 8:3 9:17 16:3,4 24:20 25:3,11,14,15 29:23 31:7 32:21 33:21,23 34:10 45:13,15 47:4,7 52:6 56:5,9 61:17 67:22 74:25 75:1 78:22 83:2,6

**receive** 8:22

**received** 20:11,17 45:13 61:4

**recent** 15:11 95:12

**receptacle** 52:6 91:7

**recognized** 91:10 97:1

**recollection** 8:6,18 16:8,18,23 24:6 25:3 30:10 33:2,5 59:2 60:18 84:3 87:10 93:6

**reconnect** 69:20

**record** 4:1,7,22 19:20 26:19 43:19 44:2,4,7,12,16 86:1,3,6 94:5 102:12

**recorded** 51:14 55:21

**recordings** 92:13

**records** 47:24

**reduce** 100:13,22 101:10

**reduced** 75:13

**reduces** 100:7,23

**reducing** 100:6

**Reemer** 31:8

**refer** 10:3 14:13

**reference** 23:10 47:14,18,22 81:25 82:18

**referenced** 20:14 22:3

**references** 47:5

**referencing** 92:23

**referring** 16:19 55:18 66:16 75:24 78:14 101:24

**refine** 49:8

**refrigerant** 67:19

**refrigerators** 68:6

**relate** 10:4,12 22:8

**related** 6:6 7:3,4 13:9,22 34:22 61:13 67:19,20,23

**relative** 59:1

**release** 27:16 30:6 31:23 35:12 36:3 42:10,25 51:10 80:4,7 101:12

**released** 68:1

**releases** 99:4

**relevant** 66:23 85:9 90:17 96:21

**reliably** 98:9,12

**relied** 9:4 66:13 87:25

**relying** 88:2

**remains** 72:14

**remember** 7:22,23

**remote** 4:2 38:18 39:18 54:15

**removed** 12:12 53:15

**render** 19:3,17 35:20

**renovations** 31:9

**renter** 26:10

**repairs** 71:2

**replace** 69:18

**replaced** 69:9,12 70:7

**replacing** 69:17

**report** 8:22,24 9:3,4,18,19,21 10:1 12:15 17:5 19:8,12,18,24,25 20:15 24:23,25 25:5,9 33:25 35:22 43:20, 21,23 44:21 45:1,8,11,13,14 46:17,19 47:5,7 48:2 50:23 51:23 52:24 61:24 66:19 68:24 69:4 81:15 82:18 87:4,6

**reported** 61:1,9 64:17 91:22

**reporter** 4:8

**reports** 5:10 12:22

**represent** 4:17 43:6

**representing** 30:22

**request** 6:5

**requested** 5:12 7:10 45:5,9

**requests** 5:24

**require** 101:10

**required** 34:25 70:11 73:1 74:3 76:4 100:8,12,25

**requires** 101:4

**reread** 16:4

**research** 5:2 45:15 70:9 75:19 76:23

77:12 82:13 84:8,20 89:24

**residence** 30:1

**residential** 23:15,19 24:7

**respect** 6:15,19 12:3 13:14 14:1 17:13,24 18:19,22 19:10 23:6 25:25 34:18 45:21 50:20 55:5 69:17 71:1 73:6 98:14

**respond** 96:6

**responding** 61:5

**response** 16:6 58:9

**result** 27:14 36:18 52:7,10 73:18 75:12 76:9,22 77:19 78:12 81:2,6 88:14 94:15

**resulted** 15:25 21:3 23:13 26:13 28:1 30:2 31:1,20,23 32:22 34:14 35:11 42:10 77:2

**resulting** 27:15 55:1 80:5

**results** 9:25 10:3,4,9 12:21 13:3 25:6 73:9,18

**retained** 10:17 14:9 17:9,25 18:16 21:8 24:15 26:4 27:17 29:7 30:15,22 31:16 32:3,18 34:15 35:14 36:8,10,24 37:8,12 38:9,24 42:8,19 43:6 45:16, 19 94:19,22 101:25

**retainer** 70:5

**retains** 14:15

**retention** 36:12

**review** 9:9,18,21 14:21 16:7 28:5 29:11 33:17,25 35:2,22 56:4,20 58:5, 11 59:10 60:18 61:19 68:16 75:8 82:24 100:3

**reviewed** 9:24 13:16,25 15:18 67:11

**reviewing** 17:22 58:8 59:13 82:18

**rights** 68:1

**rim** 36:21

**risk** 100:6,23

**road** 5:2 31:20 36:15

**Rogers** 47:20 48:4

**role** 18:18 19:1 64:5

**Romax** 50:7

**Romex** 50:9,13,16,21 53:10 54:6 80:18 82:11 83:8,15

**roof** 16:17 37:3 51:22 57:2 58:10,23

59:3

**Roofing** 36:24

**roofs** 91:19

**room** 30:12

**root** 17:11 18:1,19 30:24 31:22 32:12,14 33:20 36:1 41:5,6

**rope** 21:10,17

**Rott** 28:1,10,24

**Rotts** 27:23

**round** 61:25

**routed** 98:11

**routing** 66:18

**RTI** 9:25 10:8 11:4 86:16 87:16

**rubber** 36:2

**rule** 17:6 19:4,25 68:20,24 79:16

**ruling** 17:17 95:8

**run** 12:11 46:4 53:6 86:22 87:8

**running** 63:9 71:11 90:24

**runs** 50:8 53:8 62:12 63:18

---

## S

**safety** 68:2

**Salvatore** 29:6

**sample** 10:14 11:18,19 12:11 87:14

**samples** 11:25 86:25

**scenario** 51:12 55:5,10

**scenarios** 17:13

**scene** 6:17 7:8,9 14:17 17:23 38:14 39:15 40:20 47:12 53:16 58:2 61:6 84:24

**scenes** 15:20 38:10,12 41:2 88:1

**scheduling** 6:15

**School** 22:18

**science** 22:25 23:4

**scientific** 74:4 84:24

**scientist** 21:9 36:7

**scope** 17:7 70:4

**screen** 20:1,9 44:13 53:11

**scroll** 48:13 63:13 86:20 87:2

**SEA** 25:12

**search** 28:5

**section** 10:6

**selected** 83:3

**self-heated** 28:8

**self-loosening** 30:2

**send** 95:22

**sends** 48:3

**sense** 84:13

**sentence** 80:9 91:23 92:19 94:5

**sentences** 49:1 100:19

**separated** 27:13,15 36:20

**separation** 36:2 38:4

**sequence** 55:9

**series** 13:15 28:14,23

**service** 23:2 34:11

**services** 14:15 42:7,9

**sets** 50:12

**settled** 24:19

**severed** 84:6

**shallow** 67:25

**shank** 29:14

**shape** 80:12

**share** 6:17 8:1 95:17

**shared** 6:22 8:24 11:20

**sharing** 6:19

**sheet** 6:22 19:23 43:14 44:20 78:23

**sheets** 7:6

**sheriff's** 24:13

**Sherwin-williams** 32:3

**shield** 11:2,22 52:20 56:22

**short** 33:6 67:13 80:11 83:18

**shorting** 88:12

**shortly** 20:13 27:24

**show** 10:9 28:18 53:8,12 74:6 76:8 81:1,12,13 84:1

**showed** 52:7 92:13

**shown** 78:8

**shows** 50:9 54:3,13 82:8

**Shuttlesworth** 11:6

**sic** 14:22

**side** 16:17,22 25:1 31:20 35:17,18,19
49:17 53:17 58:24

**sign** 102:9

**sign-in** 6:22 7:6

**significant** 31:12,21 32:11 81:1

**significantly** 65:8 77:6 100:13

**similar** 28:6 29:16 38:3 96:15,20

**similarities** 29:19

**similarly** 11:2

**simple** 41:20

**simulate** 28:16

**simulations** 99:24

**simultaneously** 73:13

**single** 10:14 61:25

**sink** 42:24

**sir** 102:7

**sit** 49:7 75:10

**site** 14:19 26:7,8 29:12 38:14 42:10
54:15 57:3 58:4 59:9 60:9,15 62:17
64:16 66:25 84:4 88:21 89:1 90:6
93:1

**sites** 38:13 39:16 49:18 50:2,3,17,24
54:11,14 62:1 79:7,11,15 88:5 89:12
90:12

**sitting** 5:1 84:8

**size** 52:17 72:20,22 78:17 80:11
83:1,3,6,20 84:4 93:24 99:4

**slides** 23:9

**small** 10:6,10 49:12,15 75:1 81:23
94:1 99:2,11,14

**smaller** 49:17 82:23

**Smith** 32:3,5,7

**smoke** 58:23 59:3 65:19

**software** 48:24

**sold** 15:7

**sole** 64:4

**solid** 50:7,15

**Sondra** 48:14

**sounds** 39:4 56:13 61:23

**source** 30:9,11 38:22 39:10,21 40:19
41:9 55:25 56:1,11 57:13 65:1 80:8

**sources** 35:25 79:12 94:7

**Southeast** 31:8

**space** 49:24 54:9 57:16 62:6 63:16
80:7 101:12

**specific** 8:18 13:14 16:23 33:22 77:2
86:18 92:22 98:6

**specifically** 7:11,23 8:3,21 9:23
12:3 13:2 16:8 18:18 21:13 33:21
34:19 37:19 67:22 76:6,9 78:15 79:4
83:6 94:18

**specifics** 16:4 25:21 35:22 74:25
78:22

**spectra** 53:3

**spectroscopy** 10:8 11:1

**spell** 25:15

**splatter** 12:6

**spoken** 48:9

**spots** 81:21

**spray** 28:2,3,6,12,22 32:8

**sprayed** 28:21

**spread** 50:10 54:22 57:2,14 59:21
60:11 64:11,22 65:5,25 67:16 85:7
89:19,20

**spreads** 54:25

**Springs** 36:16,20

**Spruiell's** 73:5

**square** 28:20 47:17

**stainless** 10:6 12:2 13:11 17:10
18:20 22:18,20 27:12 38:11 73:22
76:15,18 77:6 84:15,17

**standards** 17:24

**staple** 88:20,24 89:11 90:1,3,5
93:20,23 94:1

**stapled** 72:12 89:22

**staples** 16:20,21 89:24 93:19

**stapling** 89:25

**start** 38:22 57:7 88:16 91:4 92:20
95:15

**started** 51:1,11 68:23

**starting** 48:11,17 66:4 70:10

**starts** 88:9

**state** 4:21 20:12,18,22 21:2,23 22:24
27:20,22 36:24 37:7,8,11 94:20,23,25
95:24 97:5,8,14

**statement** 35:3 57:12 80:19 81:25
82:1,20 91:9,13 94:2 96:8,12,23 97:3,
12 100:5,11,17,21

**statements** 18:12,25 62:6

**states** 97:1

**Station** 47:21 48:4

**steel** 10:6 12:3 13:12 17:10 18:20
22:19,20 23:3,11,12,16 27:12 36:20
38:11 73:22 76:15,18 77:6 78:16,23
84:15,17 93:14

**stenographic** 4:7

**stream** 74:20

**strictly** 53:20

**strike** 6:4 16:6 31:2 34:21 51:8,14,
21,24 52:2,11 61:7,8 80:11 90:9,19,
21,23,25 91:21 94:10 99:20,22
100:14

**STRIKENET** 19:12 51:22 66:19

**strikes** 99:10 100:1

**struck** 98:13,20

**structure** 24:16 25:23 26:1 27:16
29:15 35:13,25 36:3 47:17 51:15,19
96:25

**structures** 100:8

**studies** 78:8 81:1 84:1 91:16

**study** 84:19 92:1,4 93:7

**subject** 10:6,25 12:25 16:6,11 29:3
32:11 35:14 37:14 38:14 53:2 61:25

**submitted** 10:7,14 11:20

**subrogation** 35:17,19

**Subrogee** 4:4

**subsequent** 56:20

**sufficient** 73:22 76:18 84:16,17
91:11

suggests 92:19

suitable 96:25 97:9,10

summary 33:9 95:9

supplemental 45:8

supply 27:12 29:13 31:10

support 18:12,24 27:23 54:24 55:7
63:18 73:11 82:1,19 90:5 93:24 99:7

supported 81:8

supports 38:19 54:15,17 55:3 56:13
81:5 89:20

supposed 98:18

surrounded 88:8

survive 89:25

suspend 21:11

sustained 75:3

swear 4:8

sworn 4:12

system 52:1,4,10 71:4 92:2,13 97:2

---

**T**

Taker 48:25

takes 51:19

taking 4:24 80:23

talked 26:20 71:13 90:16 92:7,8

talking 61:10,11 96:19 101:9

tangents 41:15

tank 32:2 42:9,14,16,17 66:18

technical 20:7 28:5

temperature 73:22,25 74:1,3 76:15,
16 77:7 79:21 84:14,15,16

temperatures 27:14 76:19 77:7

terms 16:10 68:8 98:11

test 10:16 11:15 12:5,20 13:8,14 14:6
55:16,22,24 56:1 61:18 75:22,25
76:1,6,20 77:3,9,14,19 87:8 93:1

tested 28:25 93:3 96:24

testified 8:7 45:25 62:25 64:4 101:25

testifies 4:12

testimony 7:2 8:9 19:22 26:15,16,21

29:21 44:19 47:12 71:15 101:24

testing 12:15,16,17,18,23 13:4,18,22
15:19,23 16:1 28:6,12 37:4 53:14
61:12,15 66:22 73:17 74:6,22,25
75:4,6,11,23 82:15,21,22 92:9,12
94:7

tests 10:12 11:14 12:5,25 13:9,16
28:14,23 74:17 76:8 78:18,19 82:17

Texas 22:24 35:10 42:10 94:24 97:10

theory 29:1 57:5,6 58:15 83:7

thermal 85:14

thermocouples 28:18

thickness 28:17

thicknesses 28:15

thin 16:18 93:13

thing 98:11

things 53:23 59:1 94:13

thought 16:20 56:10 92:25

tied 20:21

ties 53:13

time 4:2 12:1,19 13:3 15:15 20:10,13
21:12 24:10 26:20,22 28:9 30:4 36:20
41:17 42:15 44:1,6 45:9 52:3 56:19
61:8,9 66:5 70:22 71:2 75:14 85:15,
19,25 86:5 91:15,16 92:10 98:21
101:15

timed 96:11

timeline 18:11,25 19:11 41:12 67:13
80:11 81:8 83:19

times 4:17

tiny 101:11

Titeflex 32:17

TNT 30:18,23

today 5:7,22 9:8,18,23 75:10

today's 67:10

toilet 29:13,14

told 44:10 66:24

Tom 74:15

ton 41:17

top 25:12 50:12 54:8 62:12,17 71:16

topic 22:18

---

torch 56:3

tornado 96:15,20

total 50:8

totality 67:2,5 85:13 89:2,12 98:14

tow 36:19

towing 36:19

Township 25:19

trace 53:7

Tracpipe 12:11 73:2 96:8,13,18,23
97:19,21 100:7,24

trade 15:7

traditional 96:9

trained 97:20,25 98:5

training 17:21 22:24

transcripts 9:9,12 69:14

transfer 78:12 79:1 80:17 81:13
82:12 83:4 84:2,11,12,18 90:4 99:8

transitioned 27:25 28:8,21

travels 91:1

trial 26:15,16 27:2 44:19 45:4

trials 26:25 27:3

truck 36:15,16,19,20

true 35:3 83:20

tubing 10:6 18:20 22:19,20 38:11

turn 58:14

turned 10:22 11:3 42:21

two-part 28:6,12,21

type 18:8 48:3 50:5 100:12

types 92:22

typical 8:5,6 10:5 88:15

typically 13:12 14:13 47:16 90:13

---

**U**

UL 74:14

ultimate 29:20

ultimately 20:4 21:3 23:20 24:19
26:6 28:20 33:3,18 35:20 42:21

unaware 62:25 63:20 67:9

**unburned** 59:14,17 60:14 62:21

**Underground** 47:18

**understand** 62:15 68:3

**understanding** 50:23 69:11 73:1
  98:3,9 100:15

**Understood** 6:21 12:14 28:25

**Underwriters** 43:3,7

**unexpected** 67:8

**uniform** 24:4

**universe** 11:14

**unlike** 93:2

**unloosening** 30:4

**unmitigated** 35:12 36:3

**unodorized** 24:9

**unthreaded** 29:14

**updated** 20:10

**upload** 7:14 19:20

**uploaded** 44:10

**USA** 27:20

**utility** 30:12

**utilize** 17:21

---

### V

**vacuum** 96:4

**valve** 29:14 42:24

**valves** 58:14

**variety** 28:16

**vary** 74:19

**vehicle** 36:22

**vehicles** 90:15

**velocity** 74:8 79:25

**vent** 92:14 93:10,12

**ventilation** 57:11 85:14

**version** 55:3

**versus** 4:5 30:18 37:25 39:6 88:14
  89:1

**vicinity** 60:17

**victim** 23:21 37:23 38:1 40:18 89:1

---

**victims** 39:23

**video** 4:2 61:21 92:13

**visible** 82:17 83:5

**voltage** 100:7,22 101:11

**volume** 42:11

---

### W

**wall** 28:14 67:20 71:19 72:12

**walls** 71:5

**Warren** 74:14 75:5 82:14,21

**water** 27:7,10,12,16 29:8,13,15 30:11
  31:13 36:16,20 42:21 43:1 53:24
  58:9,17,20,22 59:3,7 65:19 69:9,12,
  15,18,20,24 70:2,7 71:22,24

**waveform** 83:10,21 84:1,2,7

**ways** 36:4 40:25

**weather** 47:18,24 48:1

**weeks** 9:14,15

**weighed** 21:12

**whatsoever** 82:1

**wheel** 36:15

**Williams** 26:18 61:17 74:23 87:21,25
  88:2 94:19

**windshield** 36:17,21

**wire** 31:10 82:11

**wires** 50:8,13,21 53:10 54:6 55:1

**woman** 20:20 21:6

**wondering** 13:8

**wood** 57:22,25 58:18 59:8,14,17,24
  60:14,16,24 61:13,18 62:21,25 63:5,
  9,17,21,25 85:6,10 89:17,18,23 94:4

**word** 30:24 81:18

**words** 49:1 59:14

**work** 12:22 13:9,21,24 14:9 17:22
  21:1,23 26:20 43:10 45:5 68:23 69:5
  77:23 82:2 102:5

**worked** 8:13,17 15:16 24:1 27:1
  29:23 94:22,25

**working** 14:25 15:3,8,13 23:23 26:2
  27:8,22 29:24 31:17 32:5 36:25 38:23
  39:8 42:20

---

**workshop** 32:8

**world** 47:20 48:4 75:8 76:21

**worry** 96:17

**worth** 100:19

**write** 49:1 56:17,18 61:24 66:13 68:9
  71:3

**writing** 48:22

**written** 21:25 69:3

**wrong** 49:6

**wrote** 22:4

---

### Y

**years** 22:7 24:1,5 87:13

**yellow** 73:15

**young** 26:11

---

### Z

**Zillow** 47:14,15,16

**zinc** 10:11 12:4 52:25 53:3,4 79:5

**zip** 53:13

**zoom** 62:24

---